# Richmond.

## LEWIS' ADM'R v. GLENN, TRUSTEE.

### JUNE 5th, 1888.

84  947
98  313

84  947
o101  718

84  947
o102  636

1. CORPORATIONS — *Trust deeds—Subscriptions—Assignee— Case at bar.*—The National Express Company executed in Virginia a trust deed of all its estate, including money payable on assessments, to trustees for benefit of its creditors, requiring payment of all its debts, but reserving enjoyment for a specified period. This deed was shortly afterwards ratified by a meeting of the stockholders. A decree entered in a creditors' suit against the company, to which, however, the stockholders were not parties, made an assessment, or call, for thirty per cent. on all subscriptions, substituted the plaintiff for the original trustees, and authorized him to collect such assessments by suit or otherwise:

HELD:
   1. The trust deed must be construed by the laws of Virginia and is valid.
   2. It passed title to all unpaid subscriptions, with power to collect same to extent of call.
   3. The decree binds not only the company, but the stockholders also, whom the plaintiff, as such trustee and assignee, may, under, *and also independently of,* Code 1873, ch. 141, sec. 17, sue in his own name, for the amount of the call on their subscriptions.

2. IDEM—*Evidence—Stock-books—Subscriptions—Case at bar.*—In the case here, *held,* that the evidence sufficiently identifies certain books introduced by plaintiff as books of the corporation; that those books are admissible as evidence in the action against the deceased's estate; and that they, with the other testimony, afford satisfactory proof that the deceased was a stockholder, her subscription having been made in her lifetime by her authorized agent.

3. IDEM—*Statute of limitations—Assessment.*—Under Code 1873, ch. 57, sec. 3, the statute of limitations begins to run against an action for unpaid assessment, only from the time such assessment is made.

4. Practice in Chancery—*Service of Process.*—Under Code 1873, ch. 166, sec. 7, a return of summons in a suit, made by the sheriff, showing proper service upon a director or cashier of such a corporation, is sufficient, though they disclaim in their answers the right to answer officially.

5. Equitable Jurisdiction and Relief—*Trustees—Removal.*—Chancery hath power, for cause, to remove trustees in trust deeds to secure creditors, and to substitute others in their stead, by virtue of its general jurisdiction over trusts, as well as under Code 1873, ch. 155, sec. 6, as amended by Acts 1874-5, p. 423.

Error to judgment of corporation court of Norfolk city in an action of trespass on the case in *assumpsit,* wherein John Glenn, as trustee of the National Express and Transportation Company, under a trust deed executed by said company to trustees, to whom said Glenn was the successor, was plaintiff, and John N. Green, as administrator *d. b. n.,* with the will annexed, of Frances M. Lewis, deceased, was defendant. The object of this action was to recover out of the unadministered assets of the testatrix in the hands of her executor and sole legatee, Conway Whittle, at the time of his death, thirty per cent. and the interest thereon, of the call made by the decree of the chancery court of the city of Richmond, rendered December 14th, 1880, in the chancery suit then therein pending, wherein W. W. Glenn's administrator and others were complainants, and the said company, a joint stock corporation incorporated under the laws of the State of Virginia, was defendants, on the subscription of the said Frances M. Lewis of $10,000 to the capital stock of the said company, made in her lifetime by her agent, the said Conway Whittle. Verdict and judgment being for the plaintiff, and the defendant having excepted to the ruling of the court refusing to set aside the verdict and grant a new trial, and to other rulings during the trial, and the whole evidence being certified, the defendant obtained a writ of error and *supersedeas.* Opinion states the case.

*Sharp & Hughes,* for the plaintiff in error.

*John Howard,* for the defendant in error.

Richardson, J., delivered the opinion of the court.

The National Express and Transportation Company by an act passed on the 12th day of December, 1865, was chartered as a joint stock company, its capital stock to be $5,000,000, to be divided in shares of $100 each, with the privilege of increasing its capital stock to a sum not exceeding $10,000,000; and the company was authorized to commence business as soon as one-third of the capital stock was subscribed, and $100,000 of same was paid up, the chief office of the company to be kept at Richmond, Va.

In connection with its chartered privilege of engaging in the express and general transportation business, this company proclaimed, it seems, the patriotic purpose of giving employment alike to disabled Union and Confederate officers and soldiers. It was thus national in name and in its aims. Its stock was eagerly sought after, and 40,044 shares were subscribed for, and with bright prospects of a prosperous career, it went into business. In about one year, however, the company became embarrassed, and on the 20th day of September, 1866, in obedience to a previous resolution and order of the board of directors, the president of the company executed a deed of trust to three trustees for the benefit of the creditors of the company. At this time, of the over $4,000,000 of capital stock subscribed, the assessments and calls made, amounted to only twenty per cent.; the company had received in cash, $534,748, and in good notes, $54,436, making a total of $589,184 actually realized, and at which time the company's indebtedness amounted to only some $350,000, and the uncalled for and unpaid subscriptions remaining in the hands of the stockholders, amounted to largely over $3,000,000.

Very soon after this deed of assignment, there was a meeting of the stockholders of the company, which was the last

stockholders' meeting ever held, and at this meeting, among others, the following resolutions were passed :

"1. Resolved, that this meeting sees nothing in the present condition or future prospects of this company to induce despair of the ultimate success of our enterprise."

"2. That with a fund of subscribed stock, yet untouched, in the hands of solvent stockholders, amounting to upwards of $3,000,000, of which less than one-tenth will discharge all our liabilities, and less than one-fourth will enable the company to proceed prosperously with its operations, insolvency is absurd, and failure to succeed wholly unnecessary."

"3. That to pay the debts and resuscitate the credit of the company is the first duty and purpose of the stockholders, to which end every stockholder is already pledged and bound by law to the full extent of the stock owned or subscribed by him." * * *

"5. That in addition to the requisitions heretofore made, amounting in the aggregate to twenty per cent., the president and directors be instructed forthwith to make a further requisition of ten per cent. upon the stockholders—five per cent. payable within thirty days, and five per cent. within ninety days—and that they proceed without delay to enforce payment from all delinquents by the promptest and surest process of law."

By the sixth resolution, passed at the same meeting, the president and directors were advised to suspend the active operations of the company, taking due care of all its property, until the stockholders should respond to the call directed to be made so as to supply a fund sufficient to pay the debts and extend the business without further embarrassment.

The call ordered to be made was never made, no subsequent meeting of the stockholders was ever held, nor any step taken either by the president and directors or by the stockholders in aid of the purposes for which the deed of assignment had been made; and in a very short time after this stockholders'

meeting the affairs of the company were absolutely abandoned by the president and directors and by the stockholders, leaving the trustees in the deed without their needed support; thus deliberately turning their backs upon the high moral and legal obligations resting upon them to pay the just demands of their creditors, though they had by the resolutions above referred to, fully recognized the character and extent of that obligation, and had in high sounding words given renewed assurances of their ability and determination to discharge it.

In this state of things, W. W. Glenn, a creditor, having obtained a judgment in the superior court of Baltimore city against the company for $42,431 31, on the 4th of December, 1871, filed a creditor's bill in the chancery court of the city of Richmond against the National Express and Transportation Company, its president and directors and the trustees named in the deed of trust. After the institution of this suit, the plaintiff, W. W. Glenn, died and the suit was revived in the name of his personal representative, and was thereafter proceeded in by the style of Glenn's Adm'r, &c., against the National Express and Transportation Company.

The bill, after setting forth substantially the facts above stated, so far as applicable to the case, alleges that the trustees had collected little or nothing under the deed; that the visible property of the company had been seized by the creditors under attachment proceedings in various states; that only twenty per cent. had been called for from the stockholders, and that much of the amount called for had been lost by lapse of time; that the right of the trustees to act under the deed, and its validity and legal effect had been called in question in the courts of various states, and the operations of the trustees thus hindered; that it would be necessary to resort to the remainder of the subscription to the capital stock to pay the debts of the company, and that by the terms of the subscription, stockholders could not be sued until a call had been made by the company; that doubts had been expressed whether the

uncalled subscriptions passed by the terms of the deed, and that if they did not, the trustees could not sue for them; that if they did pass, the trustees could not sue for them without a call upon the stockholders, and that there was danger that they might be sacrificed in the struggle among creditors for priority; that many of the creditors were creditors for small sums and too poor to undertake such litigation, and that equity demanded that the money should be collected by an equal assessment upon all the stockholders. And the bill prayed that the court would pass upon and construe the deed of trust, and decide as to its validity and as to what passed by it to the trustees, and that to avoid the loss of the unpaid subscription by lapse of time, pending the proceedings, a receiver be appointed with power to sue for and collect all money due the company, and to reduce any property it had to money, and to collect further calls on the stockholders as soon as such calls should be made, the money to be brought into court to await its further order. It asks for an account from the trustees, for an ascertainment of the debts of the company, and the amount necessary to be assessed upon the stockholders for the purpose of paying the debts, whether under the terms of the deed or independently thereof, according as the court should decide as to the legal effect of the deed respecting the subscription remaining uncalled for at the time of the execution of the deed. It does not ask the court to make an assessment, but it obviously contemplated that the company by its president and directors, would come into court and co-operate in the objects of the suit by making assessments necessary for the payment of the debts as ascertained by the court. And the bill also contains the prayer for general relief.

Such being the scope and purpose of the original bill, it was but reasonable to expect the hearty co-operation of the company and of the trustees it its said deed of assessment, the objects of the suit being in the main identical with those for which the deed itself was executed. But this expectation was

disappointed; the company and its officers and agents, as well as the trustees in its deed of assignment, all stood aloof and permitted every thing to go by default; hence, though process was prayed against the company as well as against its officers and trustees, no process actually issued against the company itself at the filing of the original bill.   But as to Joseph R. Anderson and M. G. Harman, two directors of the company named in the bill, and both residents of the city of Richmond, there was regular personal service of process as shown by the return of the sheriff, and the said return showing further that the president of the company was a non-resident of the State of Virginia.

The affairs of the company having been abandoned by its officers and agents, and the trustees crippled and impeded in their operations, nothing further was done in connection with the original bill until the 4th of August, 1879, when, by leave of court, an amended and supplemental bill was filed charging that neither the company nor the trustees had done anything, or taken any measures in aid of the execution of the trust or to pay the creditors, but that they had neglected and refused so to do; that the books of the company had been retained by John J. Kelley, one of the trustees, who had refused the creditors of the company access to them; that a copy of the list of the stockholders had then been obtained, and that if the original books could not be had, the complainant was advised that the said copy might be used in the case; that the trustees Hoge and Kelley, were non-residents of the State, and that O'Donnell, the other trustee, had died, he having been also a non-resident, and that the company had long since ceased to exercise its franchises.   And the amended bill prays that the trustees be removed and a new trustee appointed, and that if the company should not make an assessment upon its stockholders to pay its creditors, that the court make the assessment and provide for its collection; that an account be taken of the debts and assets of the company, and that the court pro-

ceed to make a call upon the stockholders for so much of the uncalled subscriptions as may be necessary to pay the debts of the company, and authorize the same to be collected either by a receiver or by a new trustee; and the bill further prays that the National Express and Transportation Company, and the officers thereof named in the bill, and the surviving trustees be required to answer.

Process under the amended and supplemental bill was returned executed upon the company by service on Joseph R. Anderson, a director, and M. B. Poiteaux, cashier, each of whom was returned as resident of the city of Richmond, the return stating that the president of the company was not a resident, and that the other defendants were no inhabitants. Publication was made in due form against the president and other directors of the company, and against the surviving trustees.

Joseph R. Anderson, director, appeared and answered in person, not admitting that he was a director and entitled to answer officially, but averring to the best of his knowledge and recollection that he had resigned his directorship soon after his election. But the record shows that he was a director and acted as such at the last meeting of the board of directors ever held. Moreover, as the charter of the company expressly provides that "the president and directors of this corporation shall hold their offices for one year, and until their successors are chosen," and it not being pretended that any one was ever chosen as his successor, it is indisputably true that he was a director and was properly served with process.

The surviving trustees, Hoge and Kelly, filed their answer, in which, in certain respects they answered jointly, and in others, separately. The answer, a voluminous one, is but little more than a minute account of the company's affairs, and their connection therewith, as trustees, from the date of the trust deed to the date of the answer. They deny "all unlawful combination and confederacy in the said bill charged, and in general

terms they deny each and every allegation therein contained, not specially admitted; but the answer, in effect, admits each and every material allegation contained in the bill. And the respondent, Kelly, admits that the books of the company were retained by him and remained in his custody except for a short time, when they were in the hands of a receiver of a local court in the State of Maryland, and were then returned to him, and that the creditors of the company had not been allowed access to them. But the most notable thing it contained in the answer of these trustees, is the averment that they "are advised that by the true construction of said deed of trust, no part of the eighty per cent. of subscription to the capital stock, which had not been called for by said company from its subscribers, passed to said trustees."     *     *     *

The company did not appear, and the cause having been regularly matured, in October, 1879, there was a decree by default against it, and an account of the company's assets and debts, with the priorities thereof, if any, was ordered.

Sundry creditors came in by petition and were made parties to the suit. In due course the commissioner made his report showing that 40,044 shares of the capital stock had been subscribed, making the par value of all the company's stock amount to $4,004,400, of which twenty per cent. had been called by the company, and paid in or lost, making, called, $800,880, leaving par value of stock, uncalled for and unpaid, $3,203,520; that the debts of the company, secured by said trust deed in two classes, amounted, with interest to June 1st, 1880, to $509,392 41, for the payment of which the creditors can look alone to the uncalled and unpaid subscriptions to the capital stock remaining in the hands of the stockholders, the company leaving no other available assets.

The cause was finally heard upon the merits on the 14th day of December, 1880, when a decree was entered by said chancery court judicially determining the following matters:

1st. "That the deed of trust of 20th September, 1866, made

by the National Express and Transportation Company to John Blair Hoge, John J. Kelley and C. Oliver O'Donnell, was a valid deed under the laws of Virginia.

2d. That under the laws of this State, the legal effect of said deed was to grant, convey and assign to said trustees, all the estate, property, rights and credits of the said company, of every kind and wherever situated and being, and accordingly all of the said estate, property, rights and credits did pass to and were vested in the said trustees by the said deed, including the uncalled for and unpaid part of the several subscriptions to the capital stock of the said company, and the right to receive and collect the same, according to the terms of the contract of subscription, for the purposes of said trust.

3d. That the preferences provided for in said deed are legal and valid, according to the laws of Virginia.

4th. That John Blair Hoge and John J. Kelley, surviving trustees, be removed.

5th. That John Glenn be appointed as trustee in the place of said Hoge and Kelley, and that he be clothed with all the rights and powers and charged with all the duties of executing the trusts of said deed to the same effect as were the original trustees therein; but that said Glenn should not act as such trustee, until he should give bond, to be approved by the clerk, in the penalty of $100,000, conditioned for the faithful performance of his duties.

6th. That the report of the commissioner ascertaining the debts of the company and its assets be confirmed, and that the National Express and Transportation Company do pay to the various creditors, whose claims are reported by the commissioner as established, the several amounts so reported as due to said creditors.

7th. That the calls for subscriptions previously made by the company, amounting to twenty per cent. of the capital stock, had been exhausted or were unavailing, and that said company had no property or assets out of which any part of its debts

could be made, except the uncalled for and unpaid subscriptions to the capital stock, amounting to eighty per cent. thereof, the right to receive and collect which, according to the contracts of subscription, as well as the former calls, was conveyed and assigned in trust, and constituted a trust fund in the hands of the subscribers, which is primarily liable for the debts of the company, and that it was necessary and proper that thirty per cent. of said subscription be called for and required in order to make the debts of said company; and that the company had long since abandoned its business, and that for fourteen years there had been no meeting, either by the stockholders or board of directors, whatever. And it was adjudged, ordered and decreed that a call and assessment be, and the same was, made by the decree upon the capital stock and stockholders of said company of thirty per cent. of the par value of said stock, being $30 on each and every share thereof, and that "the stockholders of said company, and each and every one of them, and their legal representatives and assigns, be, and they are hereby, severally required to pay the several amounts, hereby called for and assessed, to the said John Glenn, of the city of Baltimore, in the State of Maryland, substituted trustee in the said deed of trust from said company, of September 20th, 1866, and the said trustee is hereby authorized and directed to collect and receive the said call and assessment, and to take such prompt steps to that end, by suit or otherwise, and in such jurisdictions as he may be advised, and liberty is reserved to the said creditors and to said trustee to apply for further assessments if it be found necessary."

Under this decree, the present action of *assumpsit* by John Glenn, substituted trustee, against John N. Green, administrator *de bonis non administratis cum testamento annexo*, of the estate of Mrs. Frances M. Lewis, deceased, left unadministered by Conway Whittle, her executor, at the time of his death, to recover of said John N. Green, adm'r, etc., of the estate of Mrs. Lewis in the hands of her said executor as aforesaid, the

thirty per cent. of the par value of the stock of the National Express and Transportation Company subscribed for by Mrs. Lewis in her lifetime, for which thirty per cent. a call was made by the said decree of the chancery court of Richmond, of the 14th December, 1880.

The declaration contains one special count, with the common counts added. It sets forth the matters and things contained in the bill in said chancery cause, and alleges substantially the proceedings had therein, and vouches the record in said chancery cause as authority for bringing and maintaining the present action.

The defendant demurred to the declaration, and also pleaded the general issue and the statute of limitations. And neither party demanding a jury, the whole matter of law and fact was submitted for decision to the court.

At the trial the plaintiff offered in evidence certain books of the National Express and Transportation Company, and other documentary evidence, to prove that Mrs. Lewis was, in her lifetime and at the time of her death, a subscriber for one hundred shares of the capital stock of said company; to the introduction of which evidence the defendant objected, but the court overruled the objection and admitted the evidence; and the defendant excepted. The court, after hearing all the evidence adduced, overruled the defendant's demurrer and his plea of the statute of limitations, and gave judgment for the plaintiff; whereupon, the defendant moved for a new hearing on the ground that the judgment was contrary to the law and the evidence, but the court overruled the motion, and the defendant again excepted, and in his bill of exceptions all the evidence is certified. And the case is here on a writ of error and *supersedeas* to the said judgment of the corporation court of Norfolk.

In the petition it is contended:

I. That the court erred in overruling the demurrer.

II. That though the court may not have erred in overruling

the demurrer, yet it did err in not dismissing the plaintiff's action or deciding in his favor, on the ground that the suit was wrongly brought, for the reason that the plaintiff had no capacity to sue in his own name.

III. That the court erred in finding against the defendant on the facts.

IV. That the court erred in overruling the defendant's plea of the statute of limitations.

Other errors are assigned in the petition, but they are necessarily involved in the consideration of the assignments of error above stated and need not any special notice.

As to these several errors assigned and relied upon by the plaintiff in error, we will present our view of the case as made by the record, so as to meet all the objections presented, except that raised by demurrer, which will be specifically considered, and thus dispense with any special consideration of any other assignments of error.

It is obvious that the right of recovery, in the present action, depends, first, upon the validity and effect of the trust deed of September 20th, 1866; and, second, upon the authoritative effect of the decree of the chancery court of Richmond, of December 14th, 1880, in said cause of *Glenn's Adm'r* v. *The National Express and Transportation Company.* Assuming, in the first place, that the trust deed was valid, and that the chancery court had jurisdiction of the subject matter and parties, and that all necessary and proper parties were before it, then it follows that the court had the authority and power to make the decree it did make; and, in view of the fact that the decree was never appealed from, upon well-settled principles, every stockholder of the company stands precluded thereby, and cannot be heard to question, in any collateral proceeding, either the validity of the one or the authoritative effect of the other, unless in a separate proceeding for the purpose, collusion or fraud can be shown.

That the deed was valid in every particular there can be no

doubt. It was made by the president of the company in obedience to a previous express order of the board of directors, and is, therefore, the deed of the company, a company chartered by the legislature of Virginia, having its domicil in Virginia, and its principal office in the city of Richmond, the capital of the State. The deed on its face reserves a use to the grantor, to hold the property under the title of the trustees from its date, September 20th, 1866, to the 1st of November, ensuing, if the trustees be not required by some creditor to take possession; it requires the trustees to pay out of the trust fund, all debts that shall become due from the grantor to its officers and agents for a like period; it requires the trustees to pay out of the trust funds, all debts which the grantor may incur to railroad companies, for transportation during said period, over and above the net receipts for such transportation; it reserves to the grantor all tolls and compensation for the transportation of express matter not yet delivered to consignees, or not yet transported under existing contracts, and it prefers certain creditors to others. But it is well settled by repeated decisions of this court that these and like reservations in a deed of trust, by no means invalidate it.

The pioneer decision touching the validity of this same deed, was made by the court of appeals of Maryland as early as 1867, in the case of *B. & O. R. R. Co.* v. *Glenn*, 28th Md., 287, in which Stewart, J., delivering the unanimous opinion of the court, ably treated the subject upon principle, and especially in the light of the Virginia decisions, and held the deed valid and binding in all respects. We need do no more than refer to the exhaustive opinion in that case, and the numerous decisions there referred to—among them *The Bank of Augusta* v. *Earle*, 13 Peters, 519; *State* v. *Northern Central Railway Co.*, 18 Md., 213; *Davis* v. *Turner*, 4 Gratt., 422; *Dance* v. *Seaman*, 11 Gratt., 778; *Quarles* v. *Kerr*, 14 Gratt., 54; *Forkner* v. *Stewart*, 6 Gratt., 198.

Thus the inquiry presents itself, upon what law does the

validity of the deed depend? In *Balto. and Ohio R. R. Co.* v. *Glenn, supra,* it is said : " The deed in question having been made in the State of Virginia, and by a corporation created by the laws of that State, its validity must depend upon those laws. 'It is a general principle admitting of few exceptions, that in construing contracts made in a foreign country, the courts are governed by the *lex loci* as to the essence of the contracts; that is, the rights acquired and the obligations created by it;'" citing *Sobey* v. *DeSeistre,* 2 H. and J., 191; *Trosher* v. *Everhart,* 3 G. and J., 244; and then proceeds: " The rule of comity, where the *lex loci* is foreign, adopts the law of the country where the contract is made, in placing a construction upon it. They look to the foreign law to ascertain the true character of the contract, that efficacy may be given to its obligations between the parties, unless *contra bonus mores,* or against some positive law of their own. This is necessarily the rule, otherwise no reasonable interpretation could be given to such contract. It can have no validity, except conformable to the law where made. It must have a legal origin. ' No right can be derived under any contract, made in opposition to the law where it is made;'" citing *Hall* v. *Mullin,* 5 H. and J., 193.

In *Bank of Augusta* v. *Earle, supra,* Taney, C. J. says: " That a corporation can have no legal existence out of the boundaries of the sovereignty by which it is created. It exists by force of the law, and where that ceases to operate, the corporation can have no existence. It must dwell in the place of its creation, and cannot migrate to another sovereignty. * * * Courts of justice always expound and execute it (the contract) according to the laws where made." And Judge Story, in his Conflict of Laws, says : " In the silence of any rule affirming, denying or restraining the operation of foreign laws, courts of justice presume the tacit adoption of them by their own government, unless repugnant to its policy or interest. It is not the comity of the courts, but of the nation, which is administered in the same way, and guided by

the same reasoning by which all other principles of municipal law are ascertained." In other words, as was said in *B. & O. R. R. Co.* v. *Glenn, supra,* "the universal interests of all enlightened nations prescribes this as common law to be administered by their courts."

In the light of these well-established principles, it was well said by the learned judge of the chancery court of Richmond, whose opinion is part of the record here, that "this company * * is a Virginia corporation, and as well by positive statute as by an inherent legal incident of its existence, it is domiciled in Virginia, though it may, and was, designed to do business elsewhere as well;" citing *Bank of Augusta* v. *Earle, supra,* and *Paul* v. *Virginia,* 8 Wall., 186. And with equal propriety the same judge, in substance, said: "That the deed being the deed of a Virginia corporation, executed by the president of the company under its corporate seal, by virtue and in pursuance of a resolution of the board of directors, in whom the whole management of the affairs of the company was vested by an express provision of its charter, its validity and effect should be determined by the laws of this State."

The deed being manifestly valid in every respect, we are next led to inquire what did it convey and what was its effect?

From the history of this company's affairs, already given, it will be readily understood that it has put upon record one of the most remarkable and needless failures to be found in the history of joint stock companies. It commenced business with over $4,000,000 of capital stock subscribed. In the one year of its active life, it made calls on the stockholders amounting to over $800,000, or twenty per cent. of its capital stock, much of which seems to have been lost by gross mismanagement. In the same period it contracted debts, for money borrowed and services rendered, amounting to some $350,000; and having over $3,000,000 of solvent subscriptions, uncalled for and unpaid, it made the deed in question to secure to its numerous

creditors its indebtedness aforesaid. Soon after the execution of the deed, the stockholders, in meeting assembled for considering the affairs and condition of the company financially, passed a series of resolutions declaring, among other things, as well it might, that there was nothing in the then condition or future prospects of the company to induce despair of the ultimate success of the enterprise; that with over $3,000,000 of stock, then untouched, in the hands of solvent stockholders, of which less than one-tenth would discharge all its liabilities, and less than one-fifth would enable the company to proceed prosperously with its operations, and that, under such circumstances, " *insolvency was absurd, and failure to succeed wholly unnecessary.*" And the stockholders, by said resolutions, also fully recognized it to be their first duty, legally and morally, to pay the debts and resuscitate the credit of the company, and solemnly renewed their pledges to do so, and, in furtherence of their professed object, directed the president and directors forthwith to make a call upon the stockholders for the purpose. Yet, in the face of the company's deed, by which it had assigned and dedicated, in trust, all its property rights and credits, including the uncalled for and unpaid subscriptions to its capital stock, and, in the face of their subsequent high resolves, we find that the call ordered by the stockholders at this, the last meeting ever held, was never made, nor any step taken by either the president and directors, or by the stockholders, towards the execution of the trusts in the deed; and we find the trustees holding the opinion that the uncalled subscriptions, the only available assets of the company, did not pass by the deed of trust; we find an almost unprecedented current of litigation setting in against the trustees and creditors of the company, assailing the deed as invalid, and in every conceivable way obstructing the trustees in the execution of the trust, and the creditors in their efforts to recover their just demands; we find the trustees absolutely enjoined and prohibited, in several of the States where suits were brought, from

all proceedings under the trust deed; and, strongest of all, we find the stockholders of this company, regardless of the high legal and moral obligation resting upon them to pay their debts, giving, either actually or tacitly, aid and comfort to the torrent of litigation adverse to the trustees and creditors of the company.

In this state of affairs, it is not surprising that the wronged and outraged creditors should appeal to a court of chancery of the company's domicil, not only to pass upon the validity of the deed, but to determine what it conveyed and its effect, and also to ask that the trustees named in the deed be removed and a new one substituted, and that a judicial call be made upon the stockholders sufficient for the payment of their several claims.

Recurring then to the question, what did the deed convey—it is evident from the financially embarrassed condition of the company and from the face of the deed itself, that its general and leading object in making the deed was to dedicate all of its assets and effects of every kind to the payment of its debts; to accomplish which purpose, the deed says: "The party of the first part doth hereby grant, bargain, sell, convey, assign, and set over unto the parties of the second part (the trustees) all the estate, property, rights, and credits of the said party of the first part, of every kind and wherever situated, in or out of the State of Virginia, including leases, horses, wagons, carts, harness, office furniture, safes, chests, fixtures, and other effects and moneys payable to the company, whether on calls or assessments on stock of the company, or on notes, bills, accounts, or otherwise, which properties and moneys are enumerated and set forth in a schedule to be marked A, and annexed hereto, as soon as can be conveniently done, but the omission of any property, money, or other thing from such schedule is not to prevent the same from being hereby granted or assigned." And then the deed proceeds to declare the trusts upon which it is made.

Broader and more comprehensive language could not have been employed, nor language more aptly descriptive of the property, rights, and credits designed to be and actually conveyed thereby. It contains a careful enumeration of property, things, and rights assigned, and refers to a schedule to be filed, but declares that the omission therefrom of any property is not to prevent the same from being thereby conveyed. It expressly includes "moneys payable to the company, whether on calls or assessments of stock of the company, or on notes, bills, accounts or otherwise, and though the schedule referred to was not made or annexed to the deed, yet the language employed, signifying that the omission from the schedule of *any property, money, or other thing,* should not prevent the same from being conveyed by the deed, clearly manifests the object and intent of the grantor to convey all of its estate, rights, and credits of every kind, including its uncalled subscriptions, in trust for the payment of its debts. Such was unquestionably the company's intention in executing the deed. The language employed in the deed is apt and sufficient to pass every thing the company owned, and clearly embraced the uncalled and unpaid subscriptions in the hands of its stockholders. See *Maitland* v. *Newton,* 3 Leigh, 714; citing *Comegy's* v. *Vasse,* 1 Peters, 193; *Mundy* v. *Vawter,* 3 Gratt., 518; *Griffin* v. *Macauley,* 7 Gratt., 477; *Wickham* v. *Lewis, Martin & Co.,* 13 Gratt., 427; *Milner* v. *Metz,* 16 Peters, 221.

Beyond all question, then, the deed of assignment, of 20th September, 1866, embraced and conveyed all the property, rights, and credits of the company, of every kind, wherever found, in or out of the State of Virginia, including the unpaid subscriptions to its capital stock; and the legal effect of the deed was to vest the same in the trustees, named in the deed, for the purposes of the trust, with the right to collect and receive, when authoritatively called for, the unpaid subscriptions, to the extent of the call made.

The deed being valid, and as it conveys to the trustees, for

the purposes of the trust, all the property, rights, and credits of the company, the next inquiry is, How are the rights of the creditors to be enforced?

There being no other available assets of the company, the creditors must look alone to the unpaid subscriptions to its capital stock for the payment of their debts.

The statute, sec. 3, ch. 57, Code 1873, which is the same as the like chapter in the previous Code of 1860, provides that "upon every subscription for shares in any joint stock company (other than a bank of circulation) there shall be paid upon each share two dollars at the time of subscribing, and the residue thereof as required by the president and directors." A subscription for such stock, "duly made and acccepted, confers mutual rights of contract. The advantages to be derived from being a member of the corporation, and the consequent right to participate in the pecuniary dividends, constitute the consideration for the engagement of the subscriber; and this consideration is sufficient to enable the company to maintain an action for a recovery of the amount subscribed." Boone's Law of Corporations, section 108, and authorities cited. The power thus given is a necessary incident to every joint stock company, and is so recognized by the common law; for without the right to enforce, by action, the payment of subscriptions to its capital stock, the company would have no adequate means of successfully carrying on its business, and the object for which the corporation was created would be defeated. Hence, in Boone's Law of Corporations, section 37, it is said: "The common law annexes to a corporation, when created, certain incidents and powers which, without any express provision, are deemed to be inseparable from every corporation."

The author then proceeds to enumerate some of these incidental powers, as follows: 1st. "To have perpetual succession, and, of course, of electing members in the room of those removed by death or otherwise; 2d. To sue and be sued, and to grant and receive by their corporate name; 3d. To purchase

and hold land and chattels; 4th. To have a common seal; 5th. To make by-laws for the government of the corporation; 6th. The power of amotion, or removal of members." These powers, recognized by the common law as necessarily incident to corporate existence, are, in the main regulated by our statutes, as dictated by legislative policy, and are, accordingly, either affirmative or restrictive of recognized common law principles. And whilst no powers will be implied, except those only which are incident to the very existence of the corporation, or so necessary to the enjoyment of some special grant, that without the implied power, such right would fail; yet it is an established principle, that "corporations may exercise all the powers within the fair intent and purpose of their creation, which are reasonably proper to give effect to powers expressly granted. *Ib.*, sec. 37.

Our statutes touching corporations are, in many respects, simply affirmative of recognized common law principles. Hence, by sec. 23, ch. 57, Code 1873, it is provided: " If the money which any stockholder has to pay upon his shares be not paid, as required by the president and directors, the same, with interest thereon, may be recovered by warrant, action or motion, as aforesaid; or such shares may, after notice in a newspaper for one month, of the time and place of sale, be sold at public auction for ready money and transferred to the purchaser." This statute, obviously, not only affirms a common law principle, but enlarges and amplifies the remedy at common law. It should be observed that the remedy given by the statute to make sale and transfer of the shares of a defaulting stockholder, is simply cumulative, and does not deprive the company of its right of action, nor relieve the stockholder from his obligation of payment. So that both upon common law principles and by the statute, a subscription, duly made and accepted, is a debt to the company, for which there is a continuing obligation, and which becomes due and payable, by

the terms of the subscription and by the statute, as and when called for by the president and directors. The subscription obligation, too, being continuous in character and subject to call, nothing, after the payment of the amount required by the statute to be paid at the time of subscribing, becomes due thereon until an authoritative call is. made; from which it necessarily follows that the statute of limitations cannot be interposed as a bar to. the claim, except from the time of call made, and then only as to the amount called for. As to the uncalled for subscriptions, which remain in the hands of the stockholders by virtue of an express credit extended to them by the company, it is regarded as a fund which the corporation holds for the payment of its debts. This fund, in the present case, was solemnly transferred and assigned, in trust, for the payment of the company's debts, and it turns out that the company has no other available assets. The company did not, and could not, transfer and assign its franchise right to make call on its stockholders for the payment of its debts, as provided in its deed of assignment. It was its duty, therefore, to make the necessary call or calls, and thereby enable its trustees to execute the trusts of the deed. But no call was made, nor any step taken in aid of the purposes for which the assignment in trust had been made; and after many years of enforced delay, the creditors' bill was filed in the chancery court of Richmond to enable the greatly suffering creditors to reach this solemnly dedicated fund. Moreover, not only had no step been taken in aid of the trusts created by the deed, but the company's business and affairs had, for many years, been absolutely abandoned by the president and directors and by the stockholders. But, though the corporation had ceased to do business, and its affairs had been abandoned by its officers and agents, yet under our statute, sec. 31, ch. 56, Code 1873, it had not become extinct, but could sue and be sued, *as before*, for the purpose of collecting debts due it, prosecuting rights under

previous contracts with it, and enforcing its liabilities, and distributing the proceeds of its works, property and debts among those entitled thereto.

The creditors' bill was brought in the chancery court of Richmond, a court of competent jurisdiction. Process was served upon Joseph R. Anderson, a director of the company, and upon M. B. Poiteaux, the cashier, both of whom, as shown by the return of the sheriff, were residents of the city of Richmond, and the return also showing that the process was served on said director and cashier in the city of Richmond, on the 8th of August, 1879, by delivering to each a copy, and that the president of the company was not a resident of Richmond. Both Poiteaux and Anderson appeared and answered, and while they disclaimed the right to answer officially, they recognized in their answers the service upon them officially of the process in the cause. This was unquestionably good service upon the company, and, in every respect, a compliance with the act prescribing the mode of service of process upon corporations. See sec. 7, ch. 166, Code 1873.

There can, therefore, be no valid objection to the jurisdiction of the chancery court on the ground that process was not properly served, and therefore the company was not before the court. Indeed, the notification given was not only sufficient to inform the company of the pendency of the suit, but to bind it by the decree that was subsequently rendered in the cause. See *Glenn, trustee,* v. *Williams,* 60 Md., 93, and authorities cited.

The corporation, in its corporate capacity, failed to appear, plead or answer, and the original and amended and supplemental bills were taken for confessed as against it, and at the final hearing there was a decree by default against it. No objection can be taken to the decree on this ground, either by the company in its corporate capacity, or by any stockholder. When the chancery court obtained jurisdiction in the manner above stated, the company, in its corporate capacity, was

legally before the court and amenable to its orders and decrees rendered in the cause. *U. S. Ins. Co.* v. *Shriver*, 3 Md. Ch. Dec., 381; *Boyd* v. *Ches. and Ohio Canal Co.*, 17 Md., 195. As before stated, the service of process was good service upon the company; and the company having failed to appear in court, by its president and directors, and protect its interests, it cannot be heard in any collateral proceeding to question the validity of the proceedings had against it; for, if the proceedings have been irregular, or harm has resulted to the company, which there is no reason to suspect was the case, the blame can only be laid at the door of the company's recusant officers and agents, whose duty it was, as expressly provided by the company's charter, "to represent the said company and manage the business thereof." Nor could these officers and agents excuse themselves upon the ground that the company had suspended operations, for, as we have seen, that did not render the company extinct; and, moreover, the charter expressly provides that "the president and directors of this corporation shall hold their offices for one year, and until their successors are chosen." It is not pretended that their successors were ever chosen, nor can they claim exemption from the consequences of their culpable negligence or willful desertion of the duties imposed upon them.

It cannot be doubted that the chancery court of Richmond properly acquired jurisdiction of the cause as against the corporation and the trustee, and that the decree, as against those parties, is in every respect valid, and that the proceedings, including the final decree, are valid under the laws of Virginia, and should be so held, not only in the courts of this State, but in every other jurisdiction where the same may be called in question.

Nor can the validity of the decree of the chancery court be assailed upon the ground that the stockholders, in their individual capacities, were not before the court as parties to the suit. Viewed in the light of the law of the company's corpo-

rate existence, no such objection could be entitled to serious consideration. By the first section of the charter of this corporation it is provided, among other things, that the stockholders, in the name of the corporation, "may sue and be sued, implead, and be impleaded; contract and be contracted with; purchase, hold, and grant such estates, real and personal, as may be necessary for the carrying on of the legitimate business of said company," &c. The company must, therefore, be sued by its corporate name and in its corporate capacity. The creditors seek to reach the unpaid subscriptions in the hands of the stockholders, the only available assets of the company. Upon that fund the company obtained the credit necessary to carry on its business. That fund, in the eye of the law, was set apart by the company for the payment of its corporate liabilities. See *Marsh* v. *Burroughs*, Wood's Cir. Ct. R., pp. 468–79; *Hatch* v. *Dana*, 101 U. S. R., pp. 210, 211. The corporation was not dissolved, though it had suspended operations; and the president and directors, by a provision of its charter, continued in office until their successors were chosen, with power to fill vacancies, as prescribed by the by-laws. They made no assessment or call upon the unpaid subscriptions, leaving the trustees without the means of executing the trust. In this State of things the neglected and outraged creditors besought the aid of a court of equity, and the trustees named in the deed, or the survivors of them, being desirous of surrendering the trust, and they having proved inefficient, the court was asked to remove them and appoint another in their room and stead, to have an account taken of the debts and assets, and to make a judicial call upon the stockholders and the unpaid subscriptions in their hands for an amount sufficient to pay the corporate debts. The account asked for having been taken, the court, at the final hearing of the cause, removed the two surviving trustees and appointed John Glenn, the defendant in error, as substituted trustee, and clothed him with all the rights and powers, and charged him with all the duties of executing the trusts of

said deed, to the same effect as were the original trustees therein. And by the same decree, a judicial call was made upon the stockholders and the unpaid subscriptions remaining in their hands, for thirty per cent. of the par value of said subscriptions, and the same was made payable to said substituted trustee, who was directed to take prompt steps, by *suit or otherwise*, and in such jurisdictions as he might be advised, to collect and receive the same, he being required first to give bond, with security, in the penalty of $100,000, and, after paying the costs and expenses of executing the decree, he was required to deposit his collections in the Planters National Bank of Richmond, to the credit of the court in the cause, &c.

The question is, was this a valid decree? In other words, was it necessary to the validity of the decree that the stockholders, individually, should have been before the court? So far from their being necessary parties, the bill would have been clearly demurrable had they been made parties.

In *Salmon* v. *The Hamburg Company*, 1 Cas. in Chy., 20, both the corporation and the members thereof were made parties. The stockholders demurred on the ground that they were improperly made parties. The Lord Chancellor, by his decree, dismissed the bill; but, upon appeal to the House of Lords, the demurrer of the stockholders was sustained, but the decree dismissing the bill, as against the company, was reversed, and the cause was remanded with instructions to the court of chancery to compel the company to levy an assessment upon its members, and with provisions adequate to enforce such a levy. That case was cited and approved by the supreme court of the United States in *Sawyer* v. *Upton*, 91 U. S., 61. It is, then, idle to suggest invalidity in the decree on the ground that the stockholders were not parties in their individual capacities.

Did the court have jurisdiction and authority to remove the trustees named in the deed and to substitute another? Did it have jurisdictional authority to make the necessary call upon

the stockholders and the unpaid subscriptions, and did it have like authority to clothe the substituted trustee with the powers conferred upon him by its said decree? These questions must all be answered affirmatively, and without hesitation or doubt.

1st. As to the removal of the surviving trustees and the appointment of another as a substitute, and the right to confer upon the substituted trustee the powers conferred by the decree, the court had express statutory authority. See Act of April 15th, 1874 (Acts 1874, pp. 224, 225), amending and re-enacting sec. 6 of ch. 155, Code of 1873; and Act of March 31st, 1875 (Acts of 1874–5, p. 423), amending and re-enacting sec. 8 of ch. 174, Code of 1873.

But it is useless to dwell upon the statutory authority. The court had, independently of the statutes, ample authority to remove the old trustees and substitute one in their stead; and in so doing, the court but exercised the ordinary powers of a court of equity touching the administration of trusts.

In Perry on Trusts (1 ed.,) sec. 276, it is said: "It may be stated, generally, that if the conduct or circumstances of the trustees are such as to render it very inconvenient, improper, inexpedient for them to continue in the trust, the court will exercise its discretion and relieve them, and appoint others in their place;" and in the preceeding section the same author says: "If the court have jurisdiction of the subject matter, mere irregularity in the proceedings or in the appointment will not make it void in a collateral proceeding, nor can the regularity of the proceeding or of the appointment be inquired into in a collateral suit; such appointment must stand until it is reversed by a proceeding for the purpose in the same case."

And in 2 Lewin on Trusts, p. 386, in discussing the right of appointment where the power is given by the instrument to the trustees named therein, it is said: "If the *administration of the trust* be in the hands of the *court*, the donee of the power cannot exercise it without having first obtained the court's ap-

probation of the person proposed." In this case the deed conferred no power of appointment upon the trustees therein named; hence there is no merit in the objection that there should have been a conveyance from the removed trustees to the substituted trustee; it being obvious, upon general principles, that substitution could not be substitution without conferring upon the substituted trustee all the powers and charging him with all the duties and responsibilities of his predecessors. When the court removed the old trustees and substituted a new one, the latter was, by operation of law, and by the terms of the decree itself, invested with all the powers of the old trustees, among which was the power to sue as assignee for the recovery of the several amounts due from the stockholders, respectively, to him, as such assignee, by virtue of the assessment and call judicially made by said chancery court. The power to remove trustees, for cause, and to appoint others is, in the nature of things, essentially incident to the exercise of the ordinary powers of a court of equity in the administration of trusts. To say that a court of equity, when called on to administer a trust, cannot, in a proper case, such as this was, remove an inefficient trustee and substitute another, with the view of his efficiency, would be to rob the court of the powers necessarily incident to the exercise of its legitimate authority, and to defeat the very purpose for which its jurisdiction exists.

2d. It necessarily follows that, as the chancery court of Richmond had ample jurisdictional power and authority to substitute the new trustee and to clothe him with the power and authority which was conferred by its decree, it also had ample authority to make the call upon the stockholders and the unpaid subscriptions, which was made by the same decree, and to authorize the substituted trustee to collect the same by *suit or otherwise;* the effect of which was to confer upon the substituted trustee the right to sue in his own name, and this

not only by virtue of the statute, but in the exercise of its original, inherent jurisdictional powers in the administration of trusts.

It is well settled that a court of equity may enforce payment of stock subscriptions, though there may have been no call for them by the company. *Hatch* v. *Dana*, 101 U. S. R., 214, 215; Thompson on Stockholders, secs. 15 and 345.

In this connection we will consider the demurrer of the defendant below, the plaintiff in error here, to the declaration of the plaintiff, the defendant in error here.

The ground of demurrer is, that the present action was brought in the name of the substituted trustee, when it should have been brought in the name of the company for his benefit. It is apparent that the demurrer is but another mode of attacking and bringing in question, in a collateral proceeding, the decree of the chancery court of Richmond, of December 14th, 1880. In view of what has already been said it might, therefore, be passed by without more. But in view of the earnestness with which it was insisted upon in argument, and the confidence with which authorities were relied upon to sustain it, it is perhaps proper to notice it with some care.

In support of the proposition announced as the ground of demurrer, it is said that the present action "was brought, not on the written subscription paper, which, it is said, is no where vouched in the declaration, or even referred to, but on the mere parol agreement to pay, implied from the fact of subscription to a joint stock company." And it is further said, "the subscription paper, it is true, was used in evidence, but it was not sued upon, just as if a party holding a note should sue on the common counts for money had and received and use his note as evidence, instead of suing on the note itself." This contention is plainly founded in a misconception of the structure, scope and character of the declaration, the peculiar circumstances surrounding the case, and the law applicable thereto.

As applied to the case in hand, the proposition in effect is, that the plaintiff should not only have declared on the written subscription paper, but should have made profert of the paper also, or that it would have been sufficient and proper to do so, provided the suit was brought in the name of the company for the benefit of the substituted trustee. In point of fact, the declaration is in the usual and proper form in such cases. It makes all the necessary averments, and, among them, that Mrs. Lewis was a subscriber for one hundred shares of the capital stock of the company; and then, setting forth the deed of assignment, the removal of the original trustees and the substitution of the plaintiff in their place, the call made upon the stockholders and the unpaid subscriptions, and the authority conferred with respect to the collection of said call, further alleged the consequent duty of payment to the plaintiff, the breach of that duty, and the plaintiff's right of action as substituted trustee.

It is not then like the case supposed of the holder of a note suing on the common counts for money had and received, and using the note as evidence, but is the case, universally recognized in practice, of one showing title to sue, setting out a contract obligation binding the defendant to pay and the breach thereof, by reason of which the right of action accrued, and then, at the trial, giving the contract in evidence. Such is the structure and scope of the special count in the declaration; and the common counts are added, and the whole record in the chancery cause is vouched.

The declaration, as framed, shows a perfect right of action in the plaintiff as substituted trustee, with the right to maintain the action in his own name as such. It therefore follows that the demurrer was properly overruled.

But it is earnestly insisted that the proposition contended for on demurrer is upheld by the decision of this court in the case of *Clarkson* v. *Doddridge*, 14 Gratt., 42.

That was a case in which commissioners, under a decree of

a court of equity, sold land and took the bonds payable to themselves, the bonds showing on their face.for what they were executed. Before the money was paid, the commissioners, to whom the bonds were payable, were removed and others appointed in their place. Suit was brought on the bonds, not in the name of the old commissioners for the benefit of the new, but outright in the name of the old commissioners. There was a general demurrer to the declaration and issue thereon. The defendants also tendered a special plea in bar, averring in effect, that the bonds were executed to the plaintiffs as commissioners in a chancery suit to sell certain lands; that before the action was commenced, the plaintiffs were substituted by the appointment of other commissioners, and that thereby the right of action on said bonds was taken from the old and vested in the new commissioners. The plea was objected to, and the court sustained the objection and rejected the plea; and the defendants excepted. And no ground being shown in support of the demurrer, it was overruled, and judgment was given for the plaintiff. In this court, the only question raised was as to the action of the court below in rejecting the plea in bar offered by the defendants. No notice whatever was taken of the demurrer, and, doubtless, for the simple reason that there, as here, the declaration on its face showed a complete cause and right of action.

In that case, the defence attempted to be set up by a special plea in bar being that the mere act of removing the original commissioners and appointing others in their place transferred the right of action from the former to the latter, the court held that the action was rightly brought in the name of the old commissioners in whom the legal title was vested. Here, as has been shown, the legal title is vested in the substituted trustee, yet it is insisted that this action should have been brought in the name of the company, in whom there was no legal title, for the benefit of the plaintiff, the substituted trustee. The insistance is illogical and self contradictory, in the light of

the case relied on to sustain it. But if in that case, the court had felt called on by the circumstances to exercise its full equity powers, and, instead of simply removing the old commissioners and appointing others in their place, had conferred upon the new appointees the power conferred in this case, its authority to do so could not have been questioned, and the effect would have been the same as in this case. In that case (*Clarkson* v. *Doddridge*) the right of action in the old commissioners was distinctly placed upon the ground that the *legal title* was in them. There had been in that case no assignment of the legal title, as here, nor any power conferred on the new appointees to collect by "suit or otherwise" as in this case; so that there is no analogy between that case and this, or if any, a very remote and strained one. Indeed, it is plain that if, as contended, the action here should have been brought in the name of the company for the benefit of the substituted trustee, then the action in *Clarkson* v. *Doddridge* was improperly brought in the name of the old commissioners, and should have been brought in their name for the benefit of those appointed in their place.

Indeed, if the present action had been brought in the name of the company for the benefit of the substituted trustee, the declaration would have been demurrable for want of that legal title in the company which had passed from it by the express terms of its deed of assignment.

But it is strenuously contended that this is not an action founded upon a promise in writing, but upon a *mere* chose in action and does not come within our statute (sec. 17, ch. 142, Code 1873,) which authorizes an assignee to sue in his own name only on "any bond, note, or writing not negotiable," and that, as a chose in action was not assignable at common law, and is only made so by our statute when in writing, the plaintiff, it is said, had no right to sue in his own name.

If the action could be considered as founded solely upon the subscription, that subscription being in writing and not negotiable, the assignee, under the terms of our statute, would

clearly have the right to sue in his own name, he having been, as already shown, invested with complete authority to do so. But the action is not founded upon the subscription alone, for it is obvious that upon it, without more, no right of action would ever accrue, but is founded on the contract obligation of the subscriber to contribute to the capital stock of the company, and this contract becomes mutual and binding when the subscription is only made and accepted. The contract obligation thus perfected constitutes a foundation for an action, but no right of action accrues thereon until an authorized call is made. It is frequently the case that more or less confusion arises from a failure to distinguish between the cause and the right of action. "A cause of action is said to accrue to any person when that person first comes to a right to bring an action. There is, however, an obvious distinction between a cause of action and a right, though a cause of action generally confers a right. Thus, statutes of limitation do not affect the cause of action, but take away the right." 1st Bouv. L. D., 247. Hence, in *Patterson* v. *Lynde*, 106 U. S., 521, it is said: "The liability of the stockholder is upon his subscription, that is to say, *upon his obligation* to contribute to the capital stock." It is, therefore, clear that the present action is not founded upon the subscription alone, nor upon any mere implied obligation, but on the contract obligation perfected by subscription duly made and accepted, and the default of payment as required by the call judicially made.

In this case, as both the fact of subscription and that of acceptance, too, (as we shall presently see) are in writing—that is, evidenced by writing, and not negotiable—why is it not assignable under our statute; and why may not the assignee sue thereon in his own name? Why is it not a contract evidenced by writing as much as one made through ordinary course of mail, where one party proposes and the other accepts by like means? The peculiar value of the writing is in its evidential character; and it is not essential to the validity of a

contract thus evidenced, that the written evidence of both proposal and acceptance should be on the same piece of paper. Here the subscription is conceded to be in writing, and the books of the company fully recognize the alleged subscriber as being such.

But concede for the sake of the argument, that the company's deed of assignment conveyed only an equitable title to the trustees, and that the legal title remained in the company, and that the common law rule as to the non-assignability of a chose in action would otherwise apply; yet there are well-established exceptions to the rule—one of which is, that if the obligor or debtor assents to the assignment, the action may well be brought in the name of the assignee, and that such assent can be shown not only by an express agreement of payment to the assignee, but implied by circumstances and the situation of the parties, from which the law infers and assumes such assent. This proposition is sustained by many decided cases, both English and American. *Israel* v. *Douglas*, H. Bl., 239; *Fennor* v. *Mearis*, 2d W. Bl., 1268; *Lacy* v. *McNeile*, 4th Dow. & Ryland, 7; *Wilson* v. *Coupland*, 5 Barn. & Ald., 228; *Thompson* v. *Thompson*, 5th West Va., 190; *Crocker* v. *Whitney*, 10 Mass., 319; *Mowry* v. *Todd*, 12th Mass., 281; *Currie* v. *Hodgdon*, 3d N. H., 82; *Clark* v. *Thompson*, 2d R. I., 146; *Tiernan* v. *Jackson*, 5th Peters, 597–8.

In the last named case, Mr. Justice Story said : " The question then is, whether there are any ingredients in the case furnishing sufficient proofs of such an agreement (he was speaking of the assent of the debtor in a chose in action to its assignment to an assignee for value) may be express or it may be implied, if the circumstances of the case, coupled with the acts of the parties, necessarily lead to such a conclusion." And in *Surtus* v. *Hubbard*, 4 Esp., 203, Lord Ellenborough said : " The debtor may refuse his consent; he may have an account against the assignor, and wish to have his set off; *but if there be anything like an assent on the part of the holder of the*

*money*, in that case I think that this *assumpsit*, which is an equitable action, is maintainable."

There can be no question in this case as to the assent of the stockholders to the deed of assignment for the benefit of the creditors of the company. By the law of the company's being, its members were bound to act in its corporate name, and in that name contract and be contracted with. The president and directors were the agents of the stockholders, chosen in accordance with an express provision in the charter, to " represent the said company and manage the business thereof." Moreover, in twenty days after the execution of the deed of assignment, the stockholders, in general meeting assembled, approved and ratified its execution by a resolution commanding the president and directors to make such additional calls upon the unpaid stock as might be necessary to enable the trustees to pay all the debts secured by the deed ; thus giving their emphatic assent to all that had been done and effected by the execution thereof; so that in this view the action is clearly maintainable in the name of the substituted trustee. We are, therefore, clearly of opinion that the ancient common law rule as to the non-assignability of choses in action has no application whatever to the case, and that the corporation court of Norfolk did not err in overruling the defendant's demurrer to the plaintiff's declaration in the present action.

The principles laid down in the numerous authorities above cited, and in many others that might be referred to, are, in the main, traceable to well recognized doctrines of the common law. They are essential to the attainment of the ends of justice in cases touching the enforcement of corporate liabilities, and to that end they have been adopted and applied by the courts of last resort in the several States, and by the supreme court of the United States. They need no higher sanction. In the light of these principles, corporate property and assets, especially the unpaid subscriptions, constitute a trust fund, specially set apart for the payment of corporate debts, upon the

faith of which those debts were contracted, and it will be pursued and subjected to the satisfaction of the corporate liabilities. That when, as in this case, a joint stock company makes an assignment for the benefit of its creditors, all the property and assets of the company, embraced in the deed, pass thereby to the trustees for the purposes of the trust, as provided by the instrument; and the effect of the assignment is to divest the company of the right to collect and apply such assets, and to vest that authority in the trustees. That though the company does not, and cannot, assign its right of franchise to make the calls necessary to enable the trustees to pay off the debts, and it remains its duty to make such calls, yet if it neglects or stubbornly refuses to discharge that duty, and a court of equity is called on to administer the trust, and it appears that the trustees named in the deed have proved inefficient, or, are not, for reasons satisfactory to the court, the proper persons to execute the trust, such court will remove them and appoint another or others in their place, and confer upon the trustee or trustees substituted, all the powers and authority necessary to the prompt and faithful execution of the trust; which authority is not only conferred upon the court by our statutes, but is necessarily incident to the exercise of its ordinary powers touching the administration of trusts. In short, the application of these principles exemplifies the fact that corporations, as well as natural persons, must pay their debts.

If it be said that these principles, as formulated and applied, are too modern to be endowed with the sanction of the common law, it is sufficient to reply that they are as old as the necessity for their application. Hence, in *Hoag* v. *Sawyer*, 17 Wall., 620, Mr. Justice Miller said: " Though it is a doctrine of modern date, we think it now well established that the capital stock of a corporation, especially its unpaid subscriptions, is a trust fund for the benefit of the general creditors of the corporation. And when we consider the rapid development of corporations as instrumentalities of the commercial and busi-

ness world in the last few years, with the corresponding necessity of adapting legal principles to the new and varying exigencies of this business, it is no solid objection to such a principle that it is modern, for the occasion for it could not have sooner arisen."

It only remains to consider the question, was Mrs. Lewis a subscriber for one hundred shares of the capital stock of the National Express and Transportation Company? We think the evidence clearly establishes that she was.

After so many years of obstruction and delay to the creditors of the company, during which the books and corporate records of the company were kept concealed from the creditors, and during which many evidences of membership may have been lost or destroyed, it is not to be expected that the creditors and substituted trustee could be as full-handed with proof as they would have been had the president and directors of the company performed the duties imposed upon them, or if even the stockholders had persistently pursued the course they declared it was their purpose to pursue in the aforesaid high sounding resolutions passed soon after the execution of the deed of assignment. But there is, nevertheless, ample evidence left of the fact. The stock subscribers, over one thousand in number, were widely dispersed over some twenty-odd States of the Union. In the company's stock list they are classified in certain localities. In the list of subscriptions at Norfolk, Va., we find the subscription in question in these words and figures: "Frances M. Lewis, by C. Whittle, 100 shares." On the same paper it appears that five per cent. on 390 shares of Norfolk stock was paid, which 390 shares includes the subscription aforesaid, in the name of Mrs. Lewis by C. Whittle, but it does not appear, nor is it material, when said payment was made. It does, however, satisfactorily appear from the books and papers of the company that Mrs. Lewis was accredited a stockholder to the amount of 100 shares; that calls were made from

time to time (not less than three in number), and that *Mrs. Lewis* is credited with corresponding payments.

After the creditors had been for over fourteen years denied access to the corporate records and papers, and were at last compelled to file an amended and supplemental bill, and an account of debts and assets had been ordered and was being taken, one of the original trustees, J. J. Kelley, who had been in possession of the company's books, except for a short time when they were in the hands of a receiver of a local court in the State of Maryland, in a suit touching this company's affairs, appeared before the commissioner taking the account, with certain books of the company, and gave his deposition, in which he identified the books and the handwriting of the several agents and employees of the company by whom the entries in the books were made in due course of business. But being unwilling to surrender the books absolutely, extract copies had to be made and the books returned to said trustee. Later, when the substituted trustee was appointed, these books came into his possession; and at the trial of the present action, the extracts formerly copied from said books were compared with the books from which they were taken, and both being identified by competent and uncontradicted witnesses, were offered in evidence for the plaintiff. The defendant (plaintiff in error) objected to their introduction, but the court over-ruled the objection and received them in evidence, and properly did so. It is only necessary to refer to *Stewart* v. *Valley R. R. Co.*, 32 Gratt., 146, to show that the evidence was properly admitted.

The subscription was made in 1865, prior to the charter and organization of the company thereunder—a fact that did not affect its validity, as was also decided in *Stewart* v. *Valley R. R. Co.*, *supra.*

The company made its deed of assignment on the 20th September, 1866, and very soon thereafter its business and affairs

were absolutely abandoned by the officers and agents as well as by the members of the company; and thus, though professedly full-handed, the company was proclaimed to the world as insolvent. Mrs. Lewis died in 1870, some four years after the deed was executed. She died leaving an estate of $62,972 89, which, except a comparatively trifling sum, consisted entirely of stock investments, showing that her tastes and habits were in the line of such investments. The inventory of her estate showed that she owned no property of any consequence indicating that she was a housekeeper and had a home of her own, making it fairly inferable that she made her home with her brother, and that he, of all persons, was the one likely to be selected to attend to all her business affairs. By her will, she made her said brother her sole devisee, and appointed him her executor.

It is insisted for the plaintiff in error that, as the subscription in question, or the ownership of one hundred shares of the capital stock of this company does not appear by the inventory of her estate, this circumstance militates against the idea that she was a subscriber as alleged. It is sufficient to say in answer to this suggestion, that no one can be blamed for its omission but Conway Whittle, her brother, sole devisee and executor. He had, as executor, full and unrestricted access to all her papers; and he knew of the subscription, for it had confessedly been made in her name by his hand. If the creditors had been allowed access to the books and records of the company during the lifetime of Mrs. Lewis, or even during that of Conway Whittle, this trouble could not have arisen. He would hardly have been heard to stultify himself by the assertion that his act was unauthorized by Mrs. Lewis, and that he had perpetrated a base fraud upon his aged and confiding sister and upon the company and the public. But the creditors of the company were kept in the dark until both Mrs. Lewis and Conway Whittle are dead, and for many years after, and when, at last, the substituted trustee comes

armed with ample proof—the best of which the nature of the case admits—he is met by the defendant, the plaintiff in error, who married one of the daughters of Conway Whittle, with the plea that there is no evidence that Conway Whittle was authorized to make the subscription in the name of Mrs. Lewis. If the stockholders and their agents, the president and directors, had afforded the creditors the proper facilities, so that the demand made in this action could have been made in the lifetime of Conway Whittle, this objection would never have been heard of, and the unfounded stigma upon his memory implied by this contention, would never have been suggested in avoidance of justice.

A single remark may here be added as to the plea of the statute of limitations. In *Glenn, trustee*, v. *Williams, supra*, this subject is most effectually disposed of. There were in that case several such pleas. In discussing them, Alvey, J., says: "As we have already seen, by the statute of Virginia in force at the time of the organization of the company and still in force, the subscriber to stock was required to pay two dollars on each share subscribed for, '*and the residue thereof as required by the president and directors*'; and any amount not paid as required by the president and directors, to be recovered by action, etc. All subscriptions to the stock of this corporation had reference to that provision of the statute, and the conditions or requirements there prescribed formed terms in the contract of subscription. After the payment of the two dollars per share, there was nothing due from the subscriber to stock until an authorized call was made for the residue. The contract contemplated the exercise of judgment and discretion on the part of the president and directors as to the time and amounts of future payments on the stock, and there was nothing due from the stockholder until such amounts were determined on, and regularly called for. Until a regular call was made, there was no unconditional liability on the part of the stockholder to pay. Until then he could not know when

to pay, or how much he would be required to pay. The subscription, therefore, was conditional as to the times and amounts of payment, and consequently there was no fixed obligation of the stockholder to pay, and no right of action against him, until an assessment and call made, either by the president and directors, or by the order of a court of competent jurisdiction. It is for the amount of assessment made that the right of action accrues, and not for the whole balance of the unpaid subscription, unless the whole amount be called for; and it is only from the time of assessment and call made that the statutes was in favor of the defendant." Citing a number of authorities; and among them, *Scoville* v. *Thayer*, 105 U. S., 143, and *Sinpler* v. *Turnpike Road Company*, 3 Penn. St., 413, in both of which the subject was very fully considered and the same doctrine maintained. See also *Lane's Appeal*, 105 Penn. St., 69–70, (in explanation and illustration of *Scoville* v. *Thayer*); *Smith* v. *Bell*, 107 Penn. St., 59–60, and *Glenn* v. *Semple*, 80 Ala., 380; *Glenn* v. *Soule*, 22 Fed. Rep., 417; *Glenn* v. *Springs*, 26 Fed. Rep., 494; *Glenn* v. *Scott*, 28 Fed. Rep., 804; *The Great Western Telegraph Co.* v. *Gray*, 14 N. W. R., 214. It is not pretended here that five years had elapsed, after the call made, before the present action was brought; but the claim is that the statute began to run at a period long anterior to the call made. The fact is, as already stated, that the unpaid subscriptions constituted a trust fund, upon the faith of which the debts of the company were contracted, and was primarily bound, as such, for the payment of the corporate debts; and by the very terms of the contract of subscription there was a continuing, though not unconditional, obligation to contribute to the capital stock upon call made, which call, when made, confers a right of action to the extent of the amount called for.

As before stated, the right of the plaintiff, the defendant in error, to recover in the present suit depends upon the validity

and authoritative character of the decree of the chancery court of Richmond.

After a painstaking investigation, we are clearly of the opinion that that decree is valid and binding in all respects. It was rendered by a court of competent jurisdiction, of the company's domicil, having before it all necessary and proper parties. It, therefore, absolutely concludes and binds the company and each and every one of its members, the stockholders, as to every question that was or could have been adjudicated under the pleadings and proofs in that cause. Such was held to be its effect in *Glenn, trustee,* v. *Williams, supra,* and in numerous other decisions, State and Federal, and the same effect will doubtless continue to be given to it in every jurisdiction in which it may be called in question.

This is saying but little when we reflect that the constitution of the United States requires that full faith and credit shall be given in each State to the public acts, records and judicial proceedings of every other State; and that the act of Congress providing for the mode of authenticating such acts, records and judicial proceedings, declares that, when authenticated as provided, "they shall have such faith and credit given to them in every court within the United States as they have by the law or usage in the courts of the State from which they are or shall be taken."

We do not, however, intend to be understood as saying, or even intimating, that the decree of the chancery court authorizing and directing the trustee to sue for the call, could determine the kind, manner or form of action to be brought under the decree in other forums, but that it was certainly within the jurisdiction and powers of that court, as between the creditors secured by the deed of assignment, the company itself, composed of its stockholders and representing them, and the trustees in the deed; all parties before the court, with the subject matter in hand, to determine judicially that Glenn, the substituted trustee, was entitled to the money made due

by the call, and that payment thereof should be made to him, and that he be authorized to sue for the same. And further, that, in contemplation of law, the original membership obligation of payment to the president and directors upon call, was, in effect, changed and *merged* by the deed of trust and the decree into an agreed and adjudicated duty of payment to the substituted trustee upon the call made by the court, and upon the breach of that duty the right of action to the substituted trustee in his own name was complete. For while in speaking of actions on contract it is common to say that the action is founded upon the contract, yet, as has been well remarked, " an action on contract, though said to be brought on the contract, because a contract must exist as the basis of it, is, strictly speaking, an action on the *breach of a contract;* and in order to maintain the action, it is no less necessary that a contract should be broken, than that it should exist." Decey's Par. to Actions (ed. 1879), pp. 9, 10. And in Lindley on Partnerships and Companies (Am. ed.,) 467, it is said: " Every action presupposes some duty owing by some one to some one else, and a breach actual or contemplated of such duty. *For such breach, the person to sue is the person to whom the duty is owing; and the person to be sued is the person in whom the duty resides.*"

Here the duty of payment of the judicial call was owing to the substituted trustee, the breach of duty was to him, and he was, therefore, the authorized and proper person to sue for the amount made due by the call. This being so, there can be no good reason why the stockholders, the persons to be sued, should not be bound by the decree in this as in other respects, for this is the culminating point adjudicated. It follows, therefore, that the substituted trustee was properly invested with full power and authority to sue in his own name.

The judgment of the corporation court of Norfolk is right, and the same must be affirmed.

JUDGMENT AFFIRMED.