## SAWYER *v.* HOAG, ASSIGNEE.

1. Capital stock or shares of a corporation—especially the unpaid subscriptions to such stock or shares—constitute a trust fund for the benefit of the general creditors of the corporation.
2. This trust cannot be defeated by a simulated payment of the stock subscription, nor by any device short of an actual payment in good faith.
3. An arrangement by which the stock is nominally paid, and the money immediately taken back as a loan to the stockholder, is a device to change the debt from a stock debt to a loan, and is not a valid payment as against creditors of the corporation, though it may be good as between the company and the stockholder.
4. The twentieth section of the Bankrupt Act was not intended to enlarge the doctrine of set-off beyond what the principles of legal or equitable set-off previously authorized.
5. A stockholder indebted to an insolvent corporation for unpaid shares cannot set-off against this trust fund for creditors a debt due him by the corporation. The fund arising from such unpaid shares must be equally divided among all the creditors.
6. The relations of a stockholder to the corporation, and to the public who deal with the latter, are such as to require good faith and fair dealing in every transaction between him and the corporation, of which he is part owner and controller, which may injuriously affect the rights of creditors or of the general public, and a rigid scrutiny will be made into all such transactions in the interest of creditors.

APPEAL from the Circuit Court for the Northern District of Illinois; the case being thus:

About the 1st of April, 1865, and prior, therefore, to the passage of the Bankrupt Act of 1867, the directors of the Lumberman's Insurance Company of Chicago—a company then recently incorporated and authorized to begin business on a capital of $100,000, of which not less than one-tenth should be paid in, the residue to be secured—invited subscriptions to the capital stock of the company; stating, in most instances, to those whom they invited to subscribe, that only 15 per cent. would be required to be paid down in cash, and that the remaining 85 per cent. would be lent back to the subscriber, and a note taken therefor, payable in five years, with 7 per cent. interest, payable semi-annually, se-

cured by collateral security satisfactory to the directors of the company.

In this state of things one Sawyer, about the said 1st of April, 1865, at the solicitation of one of the directors, subscribed for fifty shares of stock. When called upon to close his subscription, he was informed, as indeed all the subscribers were, that the matter would be closed on the plan above mentioned.

Sawyer accordingly complied with the requirements, and gave his check to the company for $5000, the full amount of his stock, and his note payable to it in five years from date, for $4250, that is to say, for 85 per cent. of the par value of the stock, with interest, payable as aforesaid, and delivered to the company as collateral security for the payment of his note satisfactory securities, and received from the company a check for $4250 or 85 per cent. of the par value of the stock, by way of, and as for a loan thereof from the company. At the same time Sawyer gave a written authority to the company to sell the securities at public auction, for cash, in case default should be made in the payment of the note and the interest thereon.

Sawyer subsequently took up this note and gave in substitution therefor another note, and new securities as collateral, with power, as in the case of the former ones, to sell them on default of payment of the note or interest.

At the time when the said original and substituted notes were made, money was worth and could have been lent in Chicago at from 8 to 10 per cent. interest per annum, payable semi-annually, on good security.

The original transaction was regarded and treated by the company and by Sawyer as a loan by the company to him, and his stock was treated as fully paid for. At various times after the giving of the original note, the company reported to the authorities of the State of Illinois and of other States that its capital stock was fully paid.

On the 8th and 9th day of October, A.D. 1871, a great fire devastated the city of Chicago and rendered the Lumberman's Insurance Company insolvent; and on the 25th of

January, 1872—it being at that time a notorious fact, one well understood by the public, and one which Sawyer had good reason to believe, that the said company was insolvent and unable to pay its liabilities—Sawyer purchased of a certain Hayes a certificate of an adjusted loss for $5000 against the company for 33 per cent. of its par value.

In June, 1872, after Sawyer had purchased this certificate of adjusted loss, a petition in bankruptcy was filed against the company, and it having been adjudicated a bankrupt, one Hoag was appointed its assignee.

The thirteenth section of the Bankrupt Act enacts "that after the adjudication in bankruptcy the creditors shall choose one or more assignees of the debtor." And the fourteenth section, under the marginal head of, "What is to be vested in the assignee by the adjudication of bankruptcy," &c., enacts that—

"All the property conveyed by the bankrupt in fraud of his creditors, all rights in equity, choses in action . . . all debts due him or any person for his use, and all liens and securities therefor, and all his rights of action for property or estate . . . and for any cause of action which the bankrupt had against any person . . . with the like right, title, power, and authority to sell, manage, dispose of, sue for and recover the same, as the bankrupt might or could have had if no assignment had been made, shall, in virtue of the adjudication of bankruptcy and the appointment of his assignee, be at once vested in such assignee: and he may sue for and recover the said estate, debts and effects, and may prosecute and defend all suits at law and equity, . . . *in the same manner and with the like effect as they might have been prosecuted or defended by such bankrupt.*"

The fifteenth section of the act enacts:

"That the assignee shall demand and receive from any and all persons holding the same all the estate assigned or intended to be assigned under the provisions of this act."

The sixteenth section enacts:

"That the assignee shall have the like remedy to recover all said estate, debts and effects, in his own name, as the debtor

might have had if the decree in bankruptcy had not been rendered and no assignment had been made."

Among the effects of the company, which came into Hoag's hands as assignee, was the already-mentioned note of Sawyer for $4250, with the securities assigned as collateral. Hoag demanding of Sawyer payment of this note, Sawyer produced his certificate of adjusted loss for $5000 and insisted on setting it off against the demand; asserting a right to do this under the twentieth section of the Bankrupt Act, a section in these words:

"In all cases of mutual debts or mutual credits between the parties, the account between them shall be stated, and one debt set off against the other, and the balance only shall be allowed or paid, but no set-off shall be allowed of a claim in its nature not provable against the estate:

"*Provided*, That no set-off shall be allowed in favor of any debtor to the bankrupt of a claim purchased by or transferred to him after the filing of the petition."

Hoag refused to allow the set-off, and was about to sell the collateral securities in accordance with the power given to him. Hereupon Sawyer filed a bill in the court below to enforce the set-off; in which he alleged, among other things, that the note given by him to the insurance company was for money lent to him.

The assignee, in his answer, denied that the note was for money lent, and averred that it was in fact for a balance due by Sawyer for his stock subscription, which had never been paid, and insisted that such balances constituted a trust fund for the benefit of all creditors of the insolvent corporation, which could not be made the subject of a set-off against an ordinary debt due by the company to one of its creditors. After the general replication, the case was submitted to the court below on an agreed statement of facts. That court decreed against the complainant, and from that decree the case was brought by the present appeal to this court.

*Messrs. D. L. Storey and C. Hitchcock, for the appellant:*

1. Sawyer had a right to purchase an adjusted and nego-

tiable claim against the insurance company at a discount, and to set it off against his debt, notwithstanding that he knew that the company was insolvent at the time he purchased the claim.

Under the twentieth section of the Bankrupt Act, in cases of mutual debts or credits between the parties, an account is to be stated and the balance is to be allowed or paid. Two conditions only are required: 1st. That the claim to be set-off shall be in its nature provable against the estate. 2d. That such claim shall have been purchased by or transferred to the debtor before the filing of the petition. Sawyer was within both conditions. The claim was a provable claim, and it was purchased and transferred to the debtor nearly five months before the filing of the petition in bankruptcy.

2. The assignee in bankruptcy has no greater or other right than the bankrupt would have had if there had been no proceedings in bankruptcy.

Under the fourteenth section of the Bankrupt Act rights of action of the bankrupt vest in the assignee, who may prosecute the same, "in the same manner and with like effect" as they might have been prosecuted by the bankrupt. Hoag as assignee was the representative of the insurance company, and can assert no right which it could not have asserted.*

"I have always understood," said Lord Eldon, "that the assignment from the commissioners, like any other assignment, by operation of law, passed the rights of the bankrupt precisely in the same plight and condition as he possessed them."†

Sawyer has held his claim under the certificate of loss since the 25th of January, 1872. We have seen that if the insurance company had sued him on the note it held against him, at any time prior to the filing of the petition in bankruptcy, June 20th, 1872, his defence in set-off would have been perfect, whether sued in a court of law or a court of equity. It is impossible to conceive, on the case stated, any

---

* See Bemis v. Smith, 10 Metcalf, 194.

† Mitford v. Mitford, 9 Vesey, 100; 2 Smith's Leading Cases, 370.

defence which the company could have interposed. If it is argued that the assignee has some other and higher right than the bankrupt would have had, it is incumbent on those who thus argue to show upon what statute, upon what authority, or upon what legal principle the distinction in favor of the assignee is supported.

*Mr. J. N. Jewett, contra, for the appellee:*

1. By the insolvency of the company its obligations were worth only thirty-three cents upon the dollar, and at this rate the claim sought to be set off was purchased by the appellant. If it is allowed to be set off in full he pays his own debt of $4250 with $1402.50. The insolvency, therefore, of his creditor lessens the assets to go to the general creditors by $4250, at a cost to him of less than one-third of the amount due upon his note. Surely a construction will not be given to the Bankrupt law resulting in such injustice and inequality to the creditors. It would make the Bankrupt law an instrument of fraud, instead of equal justice to all, and subvert the fundamental principles of its enactment. It must also be observed that this advantage over the other creditors would, in this case, result to a *stockholder*, and upon an obligation given in fact or effect, for his subscription for stock in the corporation. If the right of set-off as contended for by the appellant is sustained, then the directors and stockholders of an incorporated company may, in anticipation of insolvency and bankruptcy, borrow the whole or a large part of the cash assets of the company, proclaim its insolvency, depreciate its credits, and buy them up at a discount, and thus absorb the capital of the company to the exclusion of the general creditors. Justice would require that if losses are to be sustained, the stockholders, who have received the profits, should be the losers rather than the general creditors. At all events, they should not be allowed to become preferred creditors to the detriment of general creditors.

We submit, as a matter for inquiry, whether after insolvency a *mutual* debt or credit can be created between the insolvent and a third person, within the meaning of the

Bankrupt law, by a purchase of a claim against the insolvent without his knowledge or assent? Certainly *mutual* debts and credits must result from mutual and reciprocal dealings one with the other. How, then, can the purchase of a demand against a party, without his knowledge or consent, be held a mutual debt?

2. It is not true that the relative rights of parties are not changed by the bankrupt proceedings against one of them. They are changed by both *insolvency* and bankruptcy. The Bankrupt law makes any payment, sale, assignment, transfer, conveyance, or other disposition of property, by any person *insolvent* to any person who has reasonable cause to believe such person *insolvent*, within six months before the filing of a petition in bankruptcy, void, and the assignee may recover the property or value of the assets; or if such sale, assignment, &c., were not made in the usual course of business, the fact is *primâ facie* evidence of fraud. Such a transfer, but for the bankruptcy, could not be set aside or divested of its legal effect at the option of the party making it. If the claim set up by the appellant, however, was obtained in a manner and under circumstances within the spirit of the prohibition of the Bankrupt law, or subversive of its intent, the assignee may deny the right of set-off, which could not be done as against the debtor himself.

3. A set-off cannot be allowed in this case:

1st. Because the appellant was a stockholder in the Lumberman's Insurance Company at the time he purchased the claim against it.

2d. Because his note was given in part payment towards his stock subscription.

A stockholder sustains to the company in which he holds stock a relation which one who is not a stockholder does not hold; a different relation. The stockholder has the means of acquiring a knowledge of the company's affairs and condition not possessed by the other; a direct interest in its profits and losses; and stands in such a relation to the company and its other creditors, as ought to debar him, at all events, of the right to pay off his debt to the company

by the purchase and set-off of depreciated claims against it to the injury of other creditors. The note on which the assignee here claims payment is, in substance and effect, a stock note given for and existing as a part of the stock fund for the security of parties dealing with the company.

That the stock and assets of an incorporated company *are a trust fund,* for the security of its creditors, which may be followed by them into the hands of any person having notice of the trust, is an established principle, and is fully discussed and declared in many cases.*

No devices will be permitted, no shift allowed, however artfully planned and executed, to avoid the actual and *bonâ fide* payment of the stock of an incorporated company, for the creation of a fund for the security of those dealing with it. And the question, therefore, is whether this transaction was such an actual *bonâ fide* payment of his stock in full as divests the note given by the appellant of the character of a stock note, legally or equitably liable to be treated as security for the obligations of the company?

The transaction was consummated in conformity with the terms proposed when the subscription was made. Though he was required to and did give his check for the full amount of the stock, it was with the understanding that 85 per cent. of what he paid would be returned to him on the terms upon which his subscription was originally procured. The giving of a check in the first instance, for the whole amount, was but a contrivance to disguise the real transaction and its intent. It was the payment in of money with one hand and taking it out with the other. It was no absolute, unconditional payment, and was never designed to be so as to 85 per cent. These companies, when the stock is actually paid up, and they are honestly administered, are sufficiently insecure without the sanction of devices by which the fund

---

* Curran *v.* Arkansas, 15 Howard, 304; Wood *v.* Dummer, 3 Mason, 308; Lawrence *v.* Nelson, 21 New York, 158; Scammon *v.* Kimball, 6 Chicago Legal News, 3; Nathan *v.* Whitlock, 3 Edwards's Chancery, 215; McLaren *v.* Pennington, 1 Paige, 108; Long *v.* Penn Insurance Company, 6 Pennsylvania State, 421.

required by the law to be created and set apart as security to those dealing with them, can be wholly retained by the stockholders or passed back into their hands.

It is no answer to say that in this case the securities pledged for the payment of the note were ample. To allow it in any case would be opening a door for the evasion of payment of the stock, which dishonest men would be ready to take advantage of by the pledge in similar cases of worthless securities.

4. It is assumed that because the original transaction was regarded and treated *by the company* and *the complainant* as a loan to the latter, and his stock treated and regarded as paid, therefore neither the assignee nor any creditor can controvert the fact. But because it was so treated by the parties does not make it so as to third persons, assignee' or creditors. When they dispute the *bona fides* of the loan courts will look into the facts and determine whether it was a real or a colorable loan.

The fact that the company reported to the State authorities the full payment of the stock, goes for nothing more than that it was able to deceive the State officers as well as the public into the belief that the stock was fully paid, when the stockholders had only paid in the money with one hand and taken it out with the other, and had done so in pursuance of a previous concurrent agreement.

Mr. Justice MILLER delivered the opinion of the court.

The first and most important question to be decided in this case is whether the indebtedness of the appellant to the insurance company is to be treated, for the purposes of this suit, as really based on a loan of money by the company to him, or as representing his unpaid stock subscription.

The charter under which the company was organized authorized it to commence business upon a capital stock of $100,000, with ten thousand paid in, and the remainder secured by notes with mortgages on real estate or otherwise. The transaction by which the appellant professes to have paid up his stock subscription is, shortly, this: He gave to

the company his check for the full amount of his subscription, namely, $5000. He took the check of the company for $4250, being the amount of his subscription less the 15 per cent. required of each stockholder to be paid in cash, and he gave his note for the amount of the latter check, with good collateral security for its payment, with interest at 7 per cent. per annum. The appellant and the company, by its officers, agreed to call this latter transaction a loan, and the check of the appellant payment in full of his stock; and on the books of the company, and in all other respects as between themselves, it was treated as payment of the subscription and a loan of money. It is agreed that at this time the current rate of interest in Chicago was greater than 7 per cent., and it is not stated as a fact whether these checks were ever presented and paid at any bank, or that any money was actually paid or received by either party in the transaction. It must, therefore, be treated as an agreement between the corporation, by its officers, on the one part; and the appellant, as a subscriber to the stock of the company, on the other part, to convert the debt which the latter owed to the company for his stock into a debt for the loan of money, thereby extinguishing the stock debt.

Undoubtedly this transaction, if nothing unfair was intended, was one which the parties could do effectually as far as they alone were concerned. Two private persons could thus change the nature of the indebtedness of one to the other if it was found to be mutually convenient to do so. And in any controversy which might or could grow out of the matter between the insurance company and the appellant we are not prepared to say that the company, as a corporate body, could deny that the stock was paid in full.

And on this consideration one of the main arguments on which the appellant seeks to reverse the decree stands. He assumes that the assignee in bankruptcy is the representative alone of the corporation, and can assert no right which it could not have asserted. The weakness of the argument is in this assumption. The assignee is the representative of the creditors as well as the bankrupt. He is appointed

by the creditors. The statute is full of authority to him to sue for and recover property, rights, and credits, where the bankrupt could not have sustained the action, and to set aside as void transactions by which the bankrupt himself would be bound. All this, of course, is in the interest of the creditors of the bankrupt.

Had the creditors of this insolvent corporation any right to look into and assail the transaction by which the appellant claims to have paid his stock subscription?.

Though it be a doctrine of modern date, we think it now well established that the capital stock of a corporation, especially its unpaid subscriptions, is a trust fund for the benefit of the general creditors of the corporation. And when we consider the rapid development of corporations as instrumentalities of the commercial and business world in the last few years, with the corresponding necessity of adapting legal principles to the new and varying exigencies of this business, it is no solid objection to such a principle that it is modern, for the occasion for it could not sooner have arisen.

The principle is fully asserted in two recent cases in this court, namely, *Burke* v. *Smith,*\* and in *New Albany* v. *Burke.*† Both these cases turned upon the doctrine we have stated, and upon the necessary inference from that doctrine, that the governing officers of a corporation cannot, by agreement or other transaction with the stockholder, release the latter from his obligation to pay, to the prejudice of its creditors, except by fair and honest dealing and for a va'uable consideration.

In the latter case, a judgment creditor of an insolvent railroad company, having exhausted his remedy at law, sought to enforce this principle by a bill in chancery against the stockholders. The court, by affirming the right of the corporation to deal with the debt due it for stock as with any other debt, would have ended the case without further inquiry. But asserting, on the contrary, to its full extent,

---

\* 16 Wallace, 390.                                    † 11 Id. 96.

that such stock debts were trust funds in their hands for the benefit of the corporate creditors, and must in all cases be dealt with as trust funds are dealt with, it was found necessary to go into an elaborate inquiry to ascertain whether a violation of the trust had been committed. And though the court find that the transaction by which the stockholders had been released was a fair and valid one, as founded on the conditions of the original subscription, the assertion of the general rule on the subject is none the less authoritative and emphatic.*

In the case before us the assignee of the bankrupt, in the interest of the creditors, has a right to inquire into this conventional payment of his stock by one of the shareholders of the company; and on that inquiry, we are of opinion that, as to these creditors, there was no valid payment of his stock by the appellant. We do not base this upon the ground that no money actually passed between the parties. It would have been just the same if, agreeing beforehand to turn the stock debt into a loan, the appellant had brought the money with him, paid it, taken a receipt for it, and carried it away with him. This would be precisely the equivalent of the exchange of checks between the parties. It is the intent and purpose of the transaction which forbids it to be treated as valid payment. It is the change of the character of the debt from one of a stock subscription unpaid to that of a loan of money. The debt ceases by this operation, if effectual, to be the trust fund to which creditors can look, and becomes ordinary assets, with which the directors may deal as they choose.

And this was precisely what was designed by the parties. It divested the claim against the stockholder of its character of a trust fund, and enabled both him and the directors to deal with it freed from that charge. There are three or four of these cases now before us in which precisely the same thing was done by other insurance companies organ-

---

* See also Curran v. State of Arkansas, 15 Howard, 304; Wood v. Dummer, 3 Mason, 305; Slee v. Bloom, 19 Johnson, 456, and numerous other cases cited by the counsel for the appellees.

ized in Chicago, and we have no doubt it was done by this company in regard to all their stockholders.

It was, therefore, a regular system of operations to the injury of the creditor, beneficial alone to the stockholder and the corporation.

We do not believe we characterize it too strongly when we say that it was a fraud upon the public who were expected to deal with them.

The result of it was that the capital stock of the company was neither paid up in actual money, nor did it exist in the form of deferred instalments properly secured.

It is said by the appellant's counsel that conceding this, it is still a debt due by him to the corporation at the time that he became the owner of the debt due by the corporation to Hayes, and, therefore, the proper subject of set-off under the twentieth section of the Bankrupt Act. That section is as follows: "In all cases of mutual debts or mutual credits between the parties, the account between them shall be stated, and one debt set off against the other, and the balance only shall be allowed or paid, but no set-off shall be allowed of a claim in its nature not provable against the estate: *Provided*, that no set-off shall be allowed in favor of any debtor to the bankrupt of a claim purchased by or transferred to him after the filing of the petition."

This section was not intended to enlarge the doctrine of set-off, or to enable a party to make a set-off in cases where the principles of legal or equitable set-off did not previously authorize it.

The debts must be mutual; must be in the same right.

The case before us is not of that character. The debt which the appellant owed for his stock was a trust fund devoted to the payment of all the creditors of the company. As soon as the company became insolvent, and this fact became known to the appellant, the right of set-off for an ordinary debt to its full amount ceased. It became a fund belonging equally in equity to all the creditors, and could not be appropriated by the debtor to the exclusive payment of his own claim.

It is unnecessary to go into the inquiry whether this claim was acquired before the commission of an act of bankruptcy by the company, or the effect of the bankruptcy proceeding. The result would be the same if the corporation was in the process of liquidation in the hands of a trustee or under other legal proceedings. It would still remain true that the unpaid stock was a trust fund for all the creditors, which could not be applied exclusively to the payment of one claim, though held by the stockholder who owed that amount on his subscription.

Nor do we think the relation of the appellant in this case to the corporation is without weight in the solution of the question before us. It is very true, that by the power of the legislature there is created in all acts of incorporation a legal entity which can contract with its shareholders in the ordinary transactions of business as with other persons. It can buy of them, sell to them, make loans to them, and in insurance companies, make contracts of insurance with them, in all of which both parties are bound by the ordinary laws of contract. The stockholder is also relieved from personal liability for the debts of the company. But after all, this artificial body is but the representative of its stockholders, and exists mainly for their benefit, and is governed and controlled by them through the officers whom they elect. And the interest and power of legal control of each shareholder is in exact proportion to the amount of his stock. It is, therefore, but just that when the interest of the public, or of strangers dealing with this corporation is to be affected by any transaction between the stockholders who own the corporation and the corporation itself, such transaction should be subject to a rigid scrutiny, and if found to be infected with anything unfair towards such third person, calculated to injure him, or designed intentionally and inequitably to screen the stockholder from loss at the expense of the general creditor, it should be disregarded or annulled so far as it may inequitably affect him.*

---

* Lawrence *v.* Nelson, 21 New York, 158.

These principles require the affirmation of the decree in the present case, and it is accordingly

AFFIRMED.

Mr. Justice HUNT dissented, holding that the transaction was a loan by the company to the appellant.

---

### NOTE.

At the same time with the preceding case were submitted and adjudged two other cases, *Meyer* v. *Vocke, Assignee*, and *Jaeger* v. *Same Defendant*, both from the same court as the preceding case, which though differing, both, in some respects,—the latter case especially, which was a suit at law;—from the one just above reported, were declared by the court to fall within the same governing principles. In both cases the decision below had been in favor of the assignee in bankruptcy, and in both it was accordingly affirmed in this court.