JAMES E. CLAYTON et al. v. THE ORE KNOB CO.

*Corporation—Capital Stock—Reference—Report.*

1. A provision in the charter of an incorporated company that the capital stock "shall be issued as full-paid stock," does not permit shares of stock to be issued to stockholders without payment for it by them in money, or its equivalent in property at an honest valuation.

109—25

2. The report of a referee found that there were no assets of an insolvent corporation applicable to the payment of certain debts; that the capital stock ($1,500,000) had not been paid for in cash, but had simply been issued to the corporators in proportion to their several interests in certain mining property, but that there was no evidence of the value of such property: *Held*, that there was error in confirming the report; it should have been remanded with directions to inquire and report the value of the land taken in payment of the stock, and if there was any discrepancy between that value and the par value of the stock. to the end that the unpaid balance on the stock might be collected and applied for the benfit of creditors.

CIVIL ACTION, heard at Fall Term, 1891, of ASHE Superior Court, upon exceptions to referee's report, *Bynum, J.*, presiding.

The plaintiffs, Clayton and Williams, brought this action to recover large sums of money due them from the defendant. In their complaint they alleged that the defendant was insolvent, and, for causes stated, demanded that a receiver be appointed to take charge of the property and wind up its business, etc. They were large stockholders as well as creditors of the defendant and were appointed receivers. They and other creditors obtained judgments against the defendants, and its leviable property was sold for a sum of money greatly inadequate to pay its debts. The sum so realized was distributed to creditors.

In the course of the action it became and was treated as a creditor's action, and the appellant Daniel Black, a judgment creditor, was made a party plaintiff. Thereupon it was referred to a referee "to take and state an account of the effects that are, or ought to be, if any, in the hands of the said receivers belonging to said company, and the amount of capital stock of said company, paid and unpaid. That he will report specially whether there are, or ought to be, any effects in the hands of said receivers applicable to the Black judgment, and if so, how much. That he will report his findings of fact and conclusions of law separate, and make his report to August Term of this Court."

Afterwards the referee made his report, and among other findings of fact, found—

"2. I find that the capital stock of the defendant company at its organization was $1,500,000, and that the same was divided into 150,000 shares of the par value of $10 each. And that said capital stock was issued to the corporators as full paid up stock, as allowed by its charter.

3. I find that the said capital stock of said corporation was, in fact, never paid up in cash at the organization of the company or afterwards, but was issued to the corporators in proportion to their several interests in certain real estate then owned by them in Ashe County, and known as the Ore Knob property, consisting of a tract of land upon which was a mine of copper. But no evidence was offered to show the value of said real property at the time such stock was issued."

He further finds, as a conclusion of law—

"1. From the foregoing facts, I find that the receivers neither have, nor ought to have, any assets in their hands applicable to the Black judgment, and recommend that judgment be rendered accordingly.

2. I also find that all the assets that came into the hands of the receivers were paid out under order of the Court, and that plaintiff Daniel Black is concluded as to that matter by the judgments heretofore rendered."

The appellant filed exceptions to the report as follows:

"1. That plaintiffs except to the referee's finding in his first conclusion of law, and for cause of exception say that he had no evidence to sustain his finding that the receivers neither had, nor ought to have had, any assets in their hands, when the evidence showed that the paid up capital stock of the defendant was $1,500,000, and the defendant's judgment only amounted to a little over $30,000; and the receivers neither had, nor ought to have had, the balance of the paid up capital stock in excess of the debts, the said receivers themselves being the principal creditors and subscribers to

the said paid up capital stock to the amount of, to-wit, Herman Williams in the sum of $27,750, and J. E. Clayton in the sum of $28,660.

2. That plaintiffs except to the second conclusion of law by the referee, and for cause of exception say : "That he erred in finding that the plaintiffs were concluded by the judgments rendered in the cause by the receiver, when his finding of fact eighth shows that the plaintiffs were not a party to the action at the time the judgment was rendered by *Clark, Judge,* but were made a party at the succeeding term of the Court, and the order of *Armfield, Judge,* at said term could not have the effect of an original order in the cause of the said receivers against said defendant company, and that it is contrary to his finding of fact No. 9. That the said Herman Williams and J. E. Clayton were then due the company as subscribers to the capital stock more than fifty thousand dollars. While said amount constituted a trust fund for the benefit of creditors, and no part of which could be taken by them (the said Williams and Clayton) until all the other creditors were satisfied or the subscribed stock was exhausted."

The Court thereupon gave judgment, whereof the following is a copy :

"This cause coming on to be heard upon the report of Commissioner Doughton and exceptions thereto, and being heard, it is adjudged that the exceptions be overruled, and the report confirmed. That Commissioner Doughton be allowed the sum of seventy-five dollars for taking and stating the account and making his report, to be paid by the said receivers, Jas. E. Clayton and Hiram Williams, and upon the payment thereof that they be discharged from further duties and liabilities as such receivers."

Daniel Black excepted and appealed.

*Mr. G. W. Bower,* for appellant.
No counsel for appellee.

MERRIMON, C. J.—after stating the case : Although this action was not at first formally a creditor's action, it afterwards was made and treated as such, and the appellant, a judgment creditor, was properly made a party plaintiff to the end he might share in the assets of the defendant accordingly as he might be entitled. That he may have shared in assets in the hands of the receivers did not prevent him or other creditors from insisting that there were, or ought to be, other and additional assets out of which his and other unpaid debts might and should be paid. There was no final decree or judgment at the time the order of reference was made, and there is, hence, no reason why the appellant should be concluded by former orders and judgments entered in the course of the action. The action is equitable in its nature, and it was the duty of the Court to see that the receivers had collected all the assets of the defendant and distributed the same to parties entitled to have the same according to their respective rights.

Very certainly, the capital stock, paid or unpaid, of the defendant, constitutes a trust fund for the benefit of its creditors, and whatever may be the rights of the stockholders as among themselves, the creditors have the right to have such fund collected and applied to the discharge of their debts. If the capital stock has not been paid for, it is the plain duty of the Court to require it to be collected, or so much thereof as may be necessary to pay its unpaid debts. *Marshall Foundry Co.* v. *Killian,* 99 N. C., 501, and cases there cited; *Heggie* v. *B. & L. Association,* 107 N. C., 581; *Sawyer* v. *Hay,* 17 Wall., 620; *Wood* v. *Drummer,* 3 Mason, 308; Ang. and Ames Corp., § 600, *et seq.*

The defendant was incorporated for mining and smelting purposes, and it may be that its capital stock might in good faith have been paid for by its stockholders with property other than money, appropriate for its purposes, as a tract of land containing a copper mine, and when the stock has been

paid in good faith such payment would be legitimate, unless in some proper way and connection it should be alleged and proven that such payment was simulated, grossly inadequate and fraudulent, and intended to serve fraudulent purposes. In such case, such fraud appearing, the Court would compel payment of the stock, certainly less a fair price for the property so applied and used. And in an action like this, the creditor might allege the fraud and have the questions arising in that respect determined according to the course and practice of the Court. There is no valid reason why he might not. The Court has ample jurisdiction for the purpose as to parties and the subject matter embraced by the litigation.

In the present state of the pleadings in this case, no question of fraud is raised as to the payment of the capital stock of the defendant; the referee, however, finds that, in fact, it never was paid in cash, but proper certificates of stock were "issued to the corporators in proportion to their several interests in certain real estate then owned by them in Ashe County, and known as the Ore Knob property, consisting of a tract of land upon which was a mine of copper." He does not find, as he should have done, if such was the fact, that the property was received and conveyed to the company with the understanding and intent that it should be and stand as payment for the stock, or for some part of it, if so intended. It is stated by the referee that no evidence was offered to show the value of the property—whether it was treated as a payment of the stock, or some part of it, seems to have been wholly ignored. Such finding was important, and the case could not be properly disposed of without it. It is scarcely probable that the property was so intended. The capital stock was $1,500,000, divided into shares of $10 each. That is a great sum, and it is scarcely probable that the land was accepted and treated as of that value. It is more probable that the property was taken at a fair value, and the stock,

except to that extent, was never paid for. The referee should have found how the facts were. Hence, the referee's first finding of law, that the receivers "neither have, nor ought to have, any assets in their hands applicable to the" appellant's judgment, was unwarranted.

The inquiry does not involve any question of fraud. As we have said, such question does not arise in the present state of the pleadings.

The charter of the defendant provides that "said (the capital) stock shall be issued as full paid stock, shall be personal property and transferrable." This does not imply that the stock shall be issued to the stockholders without paying anything for it. Though the charter does not, in terms, imply that it may be paid for otherwise than with money, it would seem that it might be paid for with property, but surely not at a nominal, simulated price! But we advert to this provision of the charter—rather a peculiar one—only to say that it does not imply that the corporators are to receive the certificates of stock without paying for the same.

There is error. The judgment must be set aside, and the referee must be directed to find the facts as indicated in this opinion, and if it shall turn out that the capital stock of the defendant has not been so paid in property, then the receivers must be required to collect so much thereof as may be adequate to pay the appellant's debt.

AVERY, J. (dissenting): The questions presented by the appeal are—

1. Whether the referee has found that the capital stock of the company was paid up in property, if *not* in *cash.*

2. Whether, if his report can be construed to mean that it was paid in land, a judgment creditor, who has not alleged fraud in the organization of the corporation, has the right to demand that the report be remanded for the purpose of

ascertaining the value of the land conveyed in payment of stock, and of calling on the stockholders to 'pay his judgment, if the difference between the value of the property taken in lieu of cash for stock and the par value of the stock should be as much or more than the judgment, or if the difference should be less, then that the amount of the over-valuation should at all events be applied to plaintiff's judgment.

The referee reports on this subject, that the capital stock of the company was $1,500,000, divided into 150,000 shares of the par value of $10 each, and "that the said capital stock of the said corporation was, in fact, *never paid up in cash* at the organization of the company or afterwards, *but was issued to the corporators in proportion to their several interests in certain real estate, then owned by them in Ashe County and known as the Ore Knob property, consisting of a tract of land upon which was a mine of copper."* The referee further finds, that *" no evidence was offered to show the value of said real property at the time such stock was issued."*

The stock was evidently paid up, according to the report, by placing a valuation of $1,500,000 on a copper mine in Ashe County, known as Ore Knob, which was conveyed to the corporation by tenants in common, who owned it in consideration of the issue of certificates of stock to each one of said owners to an aggregate amount, which bore the same proportion to the whole capital stock of $1,500,000, that his individual interest bore to the whole interest. The referee reports the names of but three of the holders of this large amount of stock, Clayton, Williams and John Small, all of whom are judgment creditors of the corporation, and states the number of shares of stock held by only two of those three.

The proposition to remand, with directions to the referee to ascertain the real value of the property, is insisted upon on the ground that the burden is upon the stockholders, where there is no allegation of fraud or over-valuation to

show affirmatively that property conveyed as stock to a private corporation was worth the par value of the stock received (though such stock, when issued, could not be sold in the market for ten cents on the dollar), or to account to the creditors of the corporation to the extent of the sum ascertained by subtracting the real value of the property from the par value of the stock. Cook (Laws of Stock and Stockholders, §§ 44, 47, 48) states the principle to be the very reverse of that contended for here. He says, "in order to reach the person receiving paid up stock for property, the *corporate creditors* (not the corporators) must prove three things." They must prove, first, that "the property was *over-valued* and *unreasonably over-valued;*" secondly, "that the over-valuation was *intentional and fraudulent;*" thirdly, "that the person so receiving stock has made a profit thereby." If the doctrine laid down by him is supported by the weight of authority, both in this country and in England, as it seems to be, the burden would be on the creditor of a private corporation to show a fraudulent over-estimate, and it seems scarcely necessary to cite the numerous decisions of this Court to establish the proposition that he who rests his right of recovery on such ground must both allege and prove the fraud.

The judgment creditor Black has instituted no proceeding for the purpose of assailing the good faith of the corporators. To require the stockholders and promoters of a corporation to take up the laboring oar and negative the possibility that there may have been a fraudulent and intentional over-valuation of a copper mine, would be to make a dangerous and radical change in a well established rule of evidence to meet the emergency of a supposed hard case.

There can be no more doubt as to the liability of the stockholders in such cases, where fraud is properly alleged and proven by the injured party, than there is that the promoters of a pretended corporation are responsible for loss sustained

by persons who give credit to the corporation by reason of their false and fraudulent representations.

In the case of *Stracy* v. *Railroad*, 5 Dillon, 348 (10 Myers, Fed. Dig. Corp., § 167), Judge DILLON held not only that shares of stock issued to a contractor for the construction of a railroad in payment for work that was never done, were presumably valid, but that after passing into the hands of innocent purchasers such shares could not, even on proof of a fraudulent arrangement between the company and contractor, be assessed to pay the difference between the par value of the stock and the real value of the work done by the contractor. The same learned Judge declares in *Phelan* v. *Hazard*, 5 Dillon, §§ 45, 47 (10 Myers, Fed. Dig. Corp., §§ 156, 157), that property taken for stock must be held a full payment for such stock as against creditors until the agreement to take it is impeached and rescinded for fraud in a direct proceeding for that purpose, and that the creditor could not show "that the property accepted by a company in full payment of its stock was not fully worth the price of the stock, and thus compel the holder of the stock to pay the difference between such price and the alleged value of the property." 10 Myers, Fed. Dig., p. 47, §§ 127, 128. Judge DILLON cites to sustain his position a number of English cases, among them the case of *In re Boylan Hall Colliery Co.*, Law Rep., 5 ch. 346, and Pitt's cases, Law Rep., 5 ch. 11. In the former case, ten persons, after working a coal mine, which they owned as tenants in common, for some time, formed a corporation with a capital stock of £20,000 and conveyed to it the colliery for "a number of shares proportioned to their respective interests." It was held that, in the absence of fraud, the shares should be taken "as paid up by handing over the colliery," just as it should be assumed that the stock in our case was fully paid by the transfer of a copper mine instead of a coal mine. In Pitt's case, *supra*, it was held that the payment of shares of stock in a private

corporation in property must be held a payment in full *till impeached for fraud.* See also Coates' Case, L. R., 17 Eq., 131; Anderson's Case, L. R., 7 ch., div. 75; Schroeder's Case, L. R., 11 Eq., 131; Bush's Case, L. R., 9 ch., div. 554; Spargo's Case, L. R., 8 ch., 407; *Savage* v. *Ball,* 17 N. J., 142; *Smith* v. *North Am. Co*, 1 Nev., 423; *Goodrich* v. *Reynolds,* 31 Ill., 490; *Spence* v. *Iowa Valley Co.*, 36 Iowa, 407.

Proceeding upon the principles established by the authorities cited and generally recognized by the legal profession, private corporations have been and are constantly being organized and re-organized all over the State of North Carolina under the general act (*The Code,* ch. 16) for the purpose of working mines of various kinds, and with the view of promoting the growth and development of our towns. All of these companies are authorized to hold as much as three hundred acres of land, and those organized for mining and manufacturing purposes are not confined within that limit. *The Code,* §666. In all of these companies land at an agreed price constitutes a portion of the assets of the corporation, and has been taken for a part or the whole of the shares of capital stock. The prosperity of some sections of our State depends in a large measure upon the development of mines by foreign and domestic corporations. The prices of this species of property are so fluctuating, and are often fixed by the reports of their officers sent to London, Liverpool or New York, of which our citizens have no notice and in which they take no interest. It would clog and embarrass these operations and prevent the expenditure of thousands of dollars, which we have reason to expect would otherwise continue to be expended in the State, if all such corporations should be put upon notice that stockholders who hereafter advance money to develop mines or improve the real estate taken as stock, and attempt to secure such advancement by a mortgage of the property or a judgment confessed by the company so as to constitute a lien upon it,

take upon themselves, as against creditors who acquire sub-sequent liens, the burden of showing that their property, originally accepted in full payment of shares of stock, was not over-valued because such property when sold at a forced sale under execution brought a price far below the par value of the stock for which it was sold. Well established rules of evidence must not be made to depend for their existence upon the fluctuating prices of mining property.

A party relying upon fraud as a reason for holding a stock-holder to such unusual liability, should be required to insti-tute a direct proceeding to impeach the payment of stock, and to take upon himself the burden of proving not only that there was an over-valuation, but that it was intentional and fraudulent. Cook on L. of S. & S., § 44.

Judgments were rendered in favor of Herman Williams and James E. Clayton, stockholders, at the Fall Term, 1883, of the Superior Court of Ashe County, in the aggregate for about $30,000, and execution being issued, the Ore Knob land, together with the personal property brought $7,300 only. The judgment was rendered in favor of the plaintiff Black for $100 at Spring Term, 1887, and the execution issued on his judgment being in the hands of the Sheriff, when the sale was made, he was allowed to share *pro rata* in the proceeds of the sale of personalty, but received no part of the fund arising from the sale of the land. Plaintiff's judgment is not fully paid, and a large sum is still due on the judgments in favor of Williams and Clayton. The referee reports that there was no evidence offered before him to show the real value of the property, and he had no means of estimating it, except the price it brought at the sale. Herman Williams owned $27,750 and James E. Clayton $28,660 of the capital stock on January 9th, 1883, which was issued to them originally for their interest in the Ore Knob property. What other persons owned interests in said

property, what proportions they owned, and how much stock was issued to them, nowhere appears in the referee's report; but it does appear that $1,500,000 worth of stock was issued to these two and other corporators in proportion to their several interests in the mine. We know that Herman Williams and Clayton did not get all of the stock, but, in the aggregate, only $56,410, being a little over one-thirtieth of the stock issued to the owners of said mine. Who were the holders of the other shares of stock, except one John Small, or what were their respective interests in the mine given in exchange for each share, the referee did not deem it necessary to find. Clayton and Williams seem to have advanced and expended money or furnished supplies for the company. The validity of their judgments is not called in question. John Small, another stockholder, has a judgment which is still unsatisfied. The referee does not report the amount of his judgment, the extent of his original interest in the mine, or the number of shares of stock issued to him. For aught, that appears in the findings of fact, he may own all the other shares of stock, except those held by Clayton and Williams, and his stock may have been issued for a proportionate interest in the Ore Knob property.

Under all the circumstances, after a sale has been made to satisfy a number of unimpeached judgments, constituting *prima facie* liens superior to that of plaintiff, the proposed order allowing a reference for the purpose of eliciting evidence to draw in question the validity of said judgments or, what is the same thing, the apparent right to the proceeds of sale on the ground, that Clayton and Williams perpetrated a fraud, would be without precedent in the judicial annals of this or any other State. The Court cannot gratuitously, at this or any other stage of the action, raise an issue of fraud for the benefit of a party and order a referee to try that which the parties have never agreed to submit to him. The question whether these judgment creditors have fraudulently

over-valued the property given for stock, when properly raised, is an issue for the jury, till they consent to try before another tribunal.

It is true that in this action, which is in the nature of a creditor's bill, Black might have made himself a party plaintiff earlier, and when he did become a party, he might have filed a complaint alleging the fraud in distinct terms or dis-puting the claim of the other creditors, who were parties. *Wordsworth* v. *Davis*, 75 N. C., 159.

But, in my judgment, after the referee has explicitly stated that the whole stock was taken in property, I think it is too late to remand the case to him for a further report. The meaning of his language seems to me unmistakable. If Black has suffered it is the result of his own laches. He might allege fraud as a ground of relief, and have the issue tried by a jury or, by consent, by the referee. It seems that he had his claim passed upon, as he now avers, before he became a party with full notice of all that had happened. I think he has waited too long, and has no right at this late day, when the proceeds of the sale of the assets are brought into Court, and nothing remaining to be done but to distribute them among the claimants, to institute, in effect, a new action against his co-plaintiff and others.

*Per curiam.*                                          Error.