WILSON COTTON MILLS v. C. C. RANDLEMAN COTTON MILLS.

*Corporation—Stockholders, Liability of—Unpaid Subscription to Stock—Assignment by Corporation for Benefit of Creditors — Creditor's Bill—Judgments—Unconscionable Advantage.*

1. The capital stock, paid or unpaid, of a corporation being a trust fund for the benefit of creditors, it is the duty of the Courts, at the suit of creditors, to require unpaid subscriptions to be collected at least to the extent necessary to pay the unpaid debts of the corporation.

2. Although it is the better practice, yet the statute (sec. 677 of *The Code*) does not require that the number of shares subscribed for by each corporator shall be stated in the articles of agreement to form a corporation.

3. It is not the articles of agreement filed with the Clerk which fix the liability of subscribers under the statute (sec. 677 of *The Code*), but the subscriptions upon the books of the company, and hence, where the articles of agreement do not state the number of shares

of the proposed capital stock subscribed for by a corporator, he cannot, in the absence of fraudulent statement or concealment, be held liable for the whole of the unpaid capital stock of the company nor for the unpaid subscription of a co-corporator whom he knows to be insolvent. (*Hauser* v. *Tate*, 81 N. C., 81, distinguished).

4. Commissions payable to a receiver are part of the costs and expenses of the suit in which he is appointed, and should be paid as such instead of being classed as a debt payable *pro rata* with other debts.

5. This Court will not review a referee's findings of fact under a consent reference, except upon the ground, taken in apt time, that there is no testimony to support them.

6. An assignment by an insolvent corporation for the benefit of creditors will be set aside at the suit of creditors within sixty days from the assignment, as provided in section 685 of *The Code*.

7. Where an attorney of a creditor of a corporation was sent by the creditor with specific instructions concerning the collection of a claim against such corporation and, without having authority to do so, consented to the assignment by the corporation for the benefit of creditors, such creditor is not estopped by the conduct of his attorney from bringing and maintaining a creditor's bill against the corporation.

8. A draft drawn by a creditor on a debtor and accepted by the latter, covering part of an account due the former, amounts to payment and satisfaction *pro tanto* so long as it is in existence and not returned to the acceptor.

9. An account in excess of $200 cannot be split up so as to bring the same under the jurisdiction of a Justice of the Peace except as to items constituting one transaction and under $200 in amount, but objection must be made before the Justice of the Peace, otherwise it cannot be made on appeal.

10. While there is no jurisdiction to vacate a judgment except in a direct proceeding to set it aside for fraud, yet when the judgment creditor brings a creditor's bill seeking equitable jurisdiction and joining all other creditors who may make themselves parties and contribute to the expenses, etc., the latter may assert the want of equity in such judgment creditor and avoid the preference inequitably obtained by his judgment; therefore

11. Where a creditor of an insolvent corporation, by splitting up an account, obtained several judgments thereon, and no objection

was made to the jurisdiction of the Justice because of an unconscientious advantage taken of the defendant, and the creditor thereupon brought a creditor's bill making all other creditors parties, and insisted upon the preference which he had obtained by the judgments so taken, the Court, while not setting aside the judgments, will not permit them to have preference over the claims of the other creditors in the distribution of the assets of the insolvent corporation.

Civil action, tried before *Battle, J.,* at Spring Term, 1894, of Randolph Superior Court, upon exceptions to the report of P. D. Walker, referee. From the judgment of his Honor upon divers exceptions to the report, both the plaintiff and defendants appealed. The facts necessary to an understanding of the opinion, in each appeal, are sufficiently stated therein.

*Mr. B. F. Long,* for plaintiff (appellants.)
*Messrs. J. H. Dillard, L. M. Scott* and *J. N. Wilson,* for defendant.

Plaintiff's Appeal:

MacRae, J.: There is abundant authority, both in reason and decisions, for the proposition stated by the late Chief Justice Meprimon in *Clayton* v. *Ore Knob Co.,* 109 N. C., 385: "Very certainly the capital stock, paid or unpaid, of the defendant constitutes a trust fund for the benefit of its creditors, and whatever may be the rights of the stockholders as among themselves, the creditors have the right to have such fund collected and applied to the discharge of their debts. If the capital stock has not been paid for, it is the plain duty of the Court to require it to be collected, or so much thereof as may be necessary to pay its unpaid debts." Note.—For the meaning of this expression, *trust fund,* we refer to *Bank* v. *Cotton Mills,* decided at this term.

The findings of fact by the referee, affirmed and amended

by his Honor, show that the corporation defendant was formed under the general law, section 677 of *The Code*, as amended by the Act of 1885, chapter 19 (other amendments are not material to our investigation). By this law the articles of agreement filed with the Clerk, and upon which letters of incorporation are to be issued, are to contain—(1) the corporation name; (2) the business proposed; (3) the place where it is proposed to be carried on; (4) the length of time desired; (5) the names of persons who have subscribed; (6) the amount of the capital, the number of shares and amount of each.

It will be observed that in the last requirement it is not provided, as it is in similar acts of other States, that the number of shares taken by each subscriber or stockholder should be set out, although in practice it is generally done, and it would have been better had the statute required it.

The incorporators in defendant corporation seem to have complied strictly with the statute in their articles of agreement upon which the letters were issued. It is made to appear, however, as a fact, that although the capital stock stated in the articles to be $50,000, the property turned over by C. C. Randleman in payment of his subscription of $49,700 to the capital stock was a cotton mill and its products, worth, at a fair valuation, $22,447.57, and that he did not intend to pay in the balance to make up his subscription otherwise than by the application of dividends or profits which he expected to realize from the enterprise, or so much thereof as he might conveniently apply to the payment of said difference, and that he was insolvent and unable to pay it otherwise. It is also found that the other corporators participated in the formation of the company, in the conduct of its business and the dealings with creditors well knowing the said facts, and that the alleged or represented capital did not in fact exist, and that no part had been or would be paid in, except the sum of $22,447.57. It appears that a stock book was kept

by the company, which seems to have been mislaid so that it could not be produced before the referee. In said stock book C. C. Randleman subscribed for 497 shares, T. C. Worth, J. H. Ferree and L. H. Weaver for one share each. When operations were begun, under the letters of incorporation, Randleman was insolvent. We suppose by this it is meant that he was unable to pay the balance of his subscription. Weaver was also insolvent, and Worth and Ferree were solvent and possessed of large means. The corporation was rated high by Dun and Bradstreet. The venture was a failure. Large debts were contracted, and the concern failed within a year.

It is contended by counsel for plaintiff in this creditor's bill that the conclusion of law reached by the referee should have been sustained, and the Court should have declared " that the subscription of Randleman over and above the amount he paid by transferring property to the company was not actual and *bona fide*, and that Randleman, together with his associates, having obtained the charter, organized the company and conducted its business, and having dealt with outside parties, the plaintiff and other creditors who have proved their claims in the case, upon the basis of an actual and *bona fide* subscribed capital of $50,000, and upon the representation that the actual capital of the company in money or money's worth, was equal to the capital stock which it purported to have, there being no evidence that said capital has been impaired by any business losses, the said Randleman, Ferree, Weaver and Worth are jointly and severally liable to the said creditors of the corporation for the difference between the amount paid in by Randleman and his full subscription, to-wit, the sum of $27,252.43, or for so much of said amount as may be necessary to pay the costs and expenses of the suit and all the just liabilities of the corporation allowed by the referee or the Court after applying the assets of the corporation to the payment of the same,

including as part of the assets the amounts due by said Weaver, Worth and Ferree on their individual unpaid subscriptions.

There is no doubt of the liability of Randleman for the amount of his unpaid subscription, or so much thereof as may be necessary to pay the debts and costs and expenses of this action. But are the other stockholders liable on their individual unpaid subscription for the same amount? The books of the company showed the amount subscribed by each corporator to be as stated above, and while their liability for all of their said subscription, which is still unpaid, is beyond question, it is equally clear to our minds that upon their contracts they cannot be held for a larger sum than was subscribed by them. It is not the articles of agreement filed with the Clerk which bind the liability of each subscriber under our statute. It is true that if in said articles it had been stated that each subscriber had taken a certain number of shares, this notice would have bound them in their dealings, for the agreement could contain this stipulation as well as the subscription on the stock book, but the statute did not require it, and parties dealing with the corporation were not required to go to the articles to ascertain the liability of each corporator. We may say that we consider it a defect in the law not to require the corporators to state the number and value of shares taken by each corporator, but we cannot make law—we must take it and interpret it as it is written. The statute, then, only requiring the number of shares and the amount of each to be set out in the articles, we cannot hold any corporator liable for the whole amount of the capital stock because upon the articles filed it did not appear how many shares were taken by each corporator. The law requires the stockholders to name their capital and publish it to the world, and they did it, but it does not, though it ought to, require it to be stated how those shares are apportioned among the stockholders. There is a

record commonly kept by corporations called a stock book, and to this book persons interested, before dealing with said company, may have access to enable them to ascertain by whom the said shares are held. If access to this book or information on the subject shall be withheld, there is no law to compel persons to deal with the corporation. It nowhere appears that any false statements were made in reference to the ownership of the stock. Its distribution did not appear and was not required to appear in the articles of agreement. It was therefore necessary for their protection that persons proposing to deal with said corporation should inform themselves upon this point. The liability of the corporators to the amount of their subscription was established. The prospectus or published notice of incorporation failed to inform the public as to the number of shares held by each corporator, and consequently as to the liability of each for unpaid subscription. Persons proposing to deal with the said corporation must inform themselves about it. There is no evidence or findings that such information was ever withheld. It would seem, therefore, that the parties dealing with the corporation were not exercising great care in the management of their business in failing to make due examination before making contracts with the corporation.

The fallacy in plaintiffs' argument is that the "*agreement and charter*" failed to set out the distribution of shares, and therefore that all subscribers are bound as if stockholders to the whole number of shares, and that the apportionment of shares as appeared on the stock book was in derogation of the original agreement. The cases cited do not bear out plaintiffs' contention. In *Curran* v. *Arkansas*, 15 How., 304, cited also in Myers Fed. Dec., sections 1316, 1323, the State was the sole stockholder in a bank, and laws passed vesting the property of the bank in the State were in impairment of the contract between the bill-holder and the bank, and were unconstitutional.

115—31

*Sawyer* v. *Hogg*, 17 Wall., 610, was where one had sub-scribed for a certain number of shares and paid by check the full amount of his subscription, and had immediately bor-rowed 85 per cent. of the sum paid in. The Court held that this 85 per cent. was still unpaid subscription, and its pay-ment could be enforced by an assignee in bankruptcy, for the benefit of the creditors of the insolvent and bankrupt corporation.

*Wood* v. *Pearce*, 2d Disney, Cincinnati Superior Court, 411, simply holds a stockholder liable for the full amount of his subscription. And to the same effect are the citations from Angell & Ames on Corp., §§ 146, 531. We have examined many of the authorities cited by plaintiff's counsel, and they all go to show—and in this we fully concur—that subscribers, in case of insolvency of the corporation, are strictly held to the payment of the unpaid part of their subscription, and that the public, in dealing with a corporation, has the right to assume that its actual capital in money, or money's worth, is equal to the capital stock which it purports to have, unless it has been impaired by business losses. The public has also the right to assume that the capital stock has been, or will be, fully paid up, if it be necessary, in order to meet the corporate liabilities. But they nowhere reach a case like the present, where it is sought to subject subscribers to a greater amount than their unpaid subscription, such liability not being pro-vided for in the charter.

But the contention of the plaintiffs goes further. They say that permitting the capital stock to be advertised at $50,000, while to the knowledge of all the corporators the property contributed by the largest stockholder was not worth half the amount of his subscription, and he was insolvent and did not intend to pay in the balance unless the venture was a successful one and enabled him to pay it in, was a fraud upon persons dealing with said corporation, and that independent of their liability on their stock subscriptions

they are liable for the injury done, and ought to be held to the payment of the balance of the debts of the concern after the exhaustion of its assets.

This rule is stated in plaintiff's brief, with regard to the debts of an insolvent corporation: "When it is made to appear that some of the stockholders are insolvent, the solvent must pay the proportion of the insolvent, to be apportioned among them according to and up to the amount of their stock *subscribed and unpaid*" 9 Oregon, 200.

It will be seen that special reference is made to the amount of their stock *subscribed* and *unpaid*. We have found no authority for the position that a shareholder can be held upon his contract of subscription for a greater amount than his unpaid subscription, except in the case of larger liability being imposed by the statute. All tort feasors may be held liable in an action for tort for the immediate consequence of their wrongful acts. We are not prepared to hold that stockholders in corporations who have subscribed for a limited number of shares may be held liable, in case of insolvency of the corporation, for the whole amount of its debts because they knew that other stockholders who were insolvent had not paid their subscription, and did not intend to pay it. The books of the company ought to furnish to those with whom it deals a full knowledge of the names of stockholders and the number of their shares, and the charter, or the general law, the measure of their liability.

Does this case fall within the principle of *Hauser* v. *Tate*, 85 N. C., 81? In that case, the defendant permitted his name to be used and published as the president of a bank, and a business to be operated as an incorporated bank, when, in fact, there was no organization under the charter, and no bank at all—the person holding himself out as cashier, using the defendant's name as president, and carrying on a spurious business. It was held that the liability of the defendant was direct and original, and not the collateral liability of a stock-

holder upon his unpaid subscription. "The gravamen of the complaint was that there was never any proper organization under the charter, and the bank having no legal corporate existence, its name was assumed by said Simonton, and his personal banking transactions conducted thereunder in silent if not active co-operation with the defendant, and that the association of them in imposing upon the public a fraudulent as and for a regular and real banking company, and thus securing and abusing the plaintiff's confidence, to his injury and loss, renders each personally and equally exposed to his demand for redress."

The present case is different from the above. The organization was perfected under the law, the stock book showed the number of shares held by each stockholder, there is no evidence of concealment from the public of the true status of the concern, and there was nothing to hinder one from informing himself thereof. It is found that there was a stock book, and that it was mislaid and could not be produced at the hearing before the referee, which was long after the insolvency of the corporation. It was also found that the credit was extended by plaintiff, The Wilson Cotton Mills, upon the report of the financial status of defendant corporation in Dun and Bradstreet, and there was no evidence that this report was procured to be made by defendants. We concur in the view taken by his Honor that the defendant corporators are liable only for their unpaid subscriptions. This disposes of plaintiff's exceptions 6, 7, 8, 9 and 10. Exceptions 1, 2, 3, 4, 5 and 12 to the findings of fact were withdrawn.

The fourth exception is for failure to find that the deed of assignment was not regularly executed, and, therefore, was void. As we shall hold, on defendant's appeal, that this deed was void under section 685 of *The Code*, action having been brought by creditors within sixty days from its execution, it will not be necessary for us to consider this exception.

The eleventh is the last exception relied on by the plaintiff—the ruling of his Honor that the commissions of the receiver, Worth, should be included in the expenses and paid as such, instead of being classed as a debt. It seems plain to us that the commissions are a part of the costs and expenses.

No Error.

DEFENDANT'S APPEAL:

MacRAE, J.: The first and second exceptions of defendant are to findings of fact. This was a consent reference. This Court will not review such findings except upon the ground, taken in apt time, that there is no testimony to support them. *Battle* v. *Mayo*, 102 N. C., 413. We have examined the testimony sent up, and are of the opinion that there is some evidence to support the findings.

The third, fourth, fifth, sixth and seventh exceptions relate to the validity of the deed of trust and to estoppels arising from the conduct of the attorney of The Wilson Cotton Mills in connection therewith. Notwithstanding the very able argument of defendant's counsel to the effect that the making of an assignment for the benefit of all its creditors by an insolvent corporation does not fall within the spirit and meaning of section 685 of *The Code*, we are impelled to hold, that by the plain terms of the act it is in the power of a creditor to defeat the operation of " any conveyance of its property, whether absolutely or upon condition, in trust or by way of mortgage executed by any corporation " by the commencement of proceedings to enforce his claim within sixty days after the registration of said deed. This section must be interpreted in connection with all of chapter 16, of which it is a part. And section 668 of the same chapter provides means by which any creditor of an insolvent corporation may have the effects of said corporation put in the hands of a receiver, and settled under the direction of the Court.

There might be reasons why some creditor should prefer that the Court should, by its officers, take charge of the settlement of the affairs of the corporation, with the security of bonds and under its own supervision, rather than that they should be administered by trustees selected by the corporation. As to the contention that The Wilson Cotton Mills, plaintiff, is estopped from taking this step, by the act of its attorney, we think the evidence is convincing that the attorney was sent with specific instructions, and that no authority was given him to agree to the assignment on the part of his client.

We come now to the very interesting question raised by the eighth exception of defendant, whether the taking of judgments upon the account due by defendant company to the plaintiff Cotton Mills, especially those judgments covering the sum of $2,992.82, for which said defendant had given its acceptance, and the splitting up of the account in order to bring it within the jurisdiction of a Justice was a fraud upon the said jurisdiction, and whether such judgments may be attacked in this proceeding and set aside to prevent the taking by said plaintiff of an unconscientious advantage over the other creditors. In 1890, defendant company was indebted in a large sum to plaintiff Cotton Mills, and on November 14 accepted the draft of the plaintiff, at thirty days, for $2,992.82 in part payment of said account. Many of the aggregated items of said account exceeded the sum of $200 for a particular day. Said plaintiff, through its attorney, after the execution of the deed of assignment, obtained judgments for all of the open accounts, including that part of it for which the acceptance had been given, by *splitting* it up so as to bring the amounts claimed within the jurisdiction of a Justice, and so has obtained a preference, or priority, over the other creditors. That the sum of $2,992.82 included in the draft was merged into it, and while said draft was in existence and *not delivered up to the acceptor*, the said draft

amounted to a payment and satisfaction, if it was so intended, of so much of the open account, is well established. *Mauney* v. *Coit*, 86 N. C., 463 ; *Spear* v. *Atkinson*, 1 Ired., 262; *Wilson* v. *Jennings*, 4 Dev., 90. It is equally clear that an account may not thus be split in order to get the same under the jurisdiction of a Justice, except as to all items constituting one transaction. *Caldwell* v. *Beatty*, 69 N. C., 365, the leading case. It is also well settled that such objection must be made before the Justice, otherwise it cannot be made in the Superior Court on appeal. *Blackwell* v. *Dibbrell*, 103 N. C., 270. But can these judgments be attacked in this proceeding upon the ground that, under the circumstances, it is unconscientious and inequitable on the part of the plaintiff in this action to assert such rights?

This is a creditor's bill, brought under the statutes, sections 668 and 685 of *The Code*. Its object is to set aside an assignment attempted to be made by an insolvent corporation, and to bring about the settlement of the affairs of the corporation under the direction of the Court by its receiver, and for the benefit of all the creditors, and upon the doctrine that the corporate assets are a trust fund for the benefit of all the creditors. But the great principle of this jurisdiction is that when the Court takes hold of the property it will make an equitable distribution thereof in the interest of all the creditors respecting priorities theretofore acquired. The other controlling principle is that he who seeks equity must do equity.

Although there is no jurisdiction to vacate the judgment unless it be a direct proceeding to set it aside for fraud, yet when the plaintiff comes into the Court seeking its equitable jurisdiction and joining all other creditors who may make themselves parties and contribute to the expenses of the suit, they may be heard to assert the want of equity on the part of the plaintiff and the injustice of securing to it the payment of its judgments in full, because those judgments were obtained by deceit and to their detriment.

It was held in *Grantham* v. *Kennedy*, 91 N. C., 148, that while courts of equity refuse aid in cases where their action would be tantamount to the exercise of appellate jurisdiction, or simply for error in law, they will protect a party against an unconscientious advantage secured by fraud, surprise, accident or mistake, when it clearly appears that it would be iniquitous and against conscience to enforce a judgment so as to give priority over other creditors.

This is the first opportunity given the other defendants besides the defendant corporation to be heard in opposition to the enforcement of this preference, and they have quickly taken advantage of it.

We are bound by the findings of fact. The findings of fact of the referee will show that the plaintiff's attorney, who at that time was a trustee in the deed of assignment, had access to the books of defendant corporation to compare the accounts of his clients, The Wilson Cotton Mills, with the account stated in defendant's books, that he split up said account against defendant, a large part of which had been settled by acceptance; that he represented that by so doing and reducing the same to judgment, he only desired to reduce the Wilson Cotton Mill claims to judgment in order to put them on an equal footing with the indebtedness due banks, and to prevent their running out of date. It is found in sections 24 and 25 that while the representations made to Sharpe were not made with the intent that they should be communicated to defendant's president, they were so communicated, and no defence was made to the actions before the Justice. While the law of North Carolina does not hinder preferences being made by insolvent corporations before the proceedings for the appointment of receivers have been begun under the statute, and while it permits the vigilant to reap the fruits of their watchfulness—*Bank* v. *Cotton Mills*, at this term—the Courts in administering their equity jurisdiction will distribute equity in its true spirit, and while not setting aside

judgments which might have been reversed for error in law will not permit them to have a preference in their payment over other creditors in the bill when it appears that unconscientious advantage was taken in the obtaining of said judgments.

It follows that the judgment of the Court below should be so modified as to require that the fund shall be distributed ratably among the creditors without preference to the plaintiff, The Wilson Cotton Mills, by reason of its judgments.

Error.   Modified.